945 F.2d 1365
 35 Soc.Sec.Rep.Ser. 194, Unempl.Ins.Rep. (CCH) P 16286A,
2 NDLR P 98
 Donna JONES, Plaintiff-Appellant,
v.
SECRETARY, HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 90-3492.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 22, 1991.
Decided Sept. 30, 1991.
 
 Debra S. Shifrin (argued and briefed), Emershaw, Mushkat & Schneier, Akron, Ohio for plaintiff-appellant.
 Michael Anne Johnson, (argued), Iden Grant Martyn, (briefed), Michael A. Jeter, Asst. U.S. Attys., Office of U.S. Atty., Cleveland, Ohio, for defendant-appellee.
 Before GUY and BOGGS, Circuit Judges, and EDWARDS, Jr., Senior Circuit Judge.
 GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 
 
 1
 Plaintiff, Donna Jones, formerly a secretary, indisputably suffers from the collapse of 60 percent to 70 percent of the fourth vertebrae of her back. However, the Secretary of Health and Human Services has denied her claim for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 et seq., finding that there is no objective basis for her claim. The district court affirmed this judgment, and plaintiff now seeks reversal. Because we find that the record lacks substantial evidence upon which to base the Secretary's conclusions, we vacate the judgment of the district court and remand to the Secretary for further proceedings.
 
 I. BACKGROUND
 
 2
 At the time of her administrative hearing, Donna Jones was fifty-six years old. She was born and raised in Akron, Ohio. After graduating from high school, she steadily worked for twenty-four years as a secretary in the area. She has worked for Firestone Tire & Rubber, Eastern Greyhound, and most recently as a temporary secretary for Kelly Services and Superior Staffing. On December 27, 1984, she was on the verge of completing a ten-month assignment with Adjustco Company and expected to be placed on the permanent payroll. On that day, she slipped and fell on icy steps.
 
 
 3
 After the fall, Jones never returned to full-time secretarial employment. The fourth vertebrae of her spine was fractured and, since then, she has allegedly experienced debilitating pain in the upper thoracic region of her back whenever she stands or sits for any extended period of time. Sixty to seventy percent of her thoracic vertebrae have collapsed. Her treating orthopedic physician, Dr. Robert Kepley, expects "that her condition will continue on a permanent basis as there is no other medical or surgical remedy that can help her out of this current dilemma." Her other personal physician, Dr. Mark Apte, and his associate, Dr. Susan Yeahley, share this opinion.
 
 A. Donna Jones' Ailment
 
 4
 The prognosis of Jones' condition was long in coming. At first, Jones' personal physician, Dr. Apte, thought she suffered a minor sprain. On December 31, 1984, her first visit to Dr. Apte after the injury, he noted "no bones were broken," and recommended heat compresses and bed rest.[1] However, in subsequent weekly visits, Jones asserted that her back pain was so great that she could no longer comfortably bend, sit, or stand.[2] When, on February 3, 1985, Jones' ability to flex had dwindled to six degrees, Dr. Apte referred her to an orthopedic surgeon, Dr. Robert Kepley.
 
 
 5
 Jones reiterated her complaint that "she has pain with any prolonged standing or sitting," during her first examination with Dr. Kepley, on February 19, 1985. After re-examining the x-rays taken at the time of Jones' fall, Dr. Kepley determined that there was a fifty percent compression fracture of the fourth thoracic vertebrae of her spine. He prescribed a back brace and a cane to keep the spine in an upright and rigid position until the fracture healed. After this treatment, the x-rays showed "good consolidation of the fracture."
 
 
 6
 Dr. Kepley did not take new x-rays until February 22, 1988. In the interim three-year period, Jones continued to complain of back pain. Nonetheless, Dr. Kepley assumed Jones' problem was now "postural" in origin. When she complained that she could not bear to sit at a typewriter for more than one and one-half hours, Dr. Kepley reassured her that "it would merely take more time for her to build up tolerance for an eight hour day." When her complaints continued, Dr. Kepley prescribed a physical fitness and strengthening program. Afterward, when Jones still complained of back pain, Dr. Kepley prescribed only a mild pain reliever, Motrin. It was only after Dr. Kepley took new x-rays in 1988 that he recognized that her fracture had never healed.
 
 
 7
 Meanwhile, she tried to return to secretarial work. She went back to Superior Staffing, her employer at the time of her injury. The temporary secretary agency accommodated Jones, assigning her to an office where she could set her own hours, not carry objects, bend, or stand for an extended period of time. Despite these accommodations, Jones found that she could not meet even the lenient demands of this position: "[F]or every 4 hrs worked, I spent 18 on ice & flat on back, and spasms got worse." On December 3, 1986, she stopped working altogether.
 
 
 8
 For the next year, Jones led a sedentary life, resting in her apartment. She continued to assert that she was experiencing back pain. Even climbing the stairs to her second-floor bedroom had become an ordeal.[3] By the end of the year, her savings had dwindled to $20 in her bank account, and she turned to her daughter for financial support.[4] On December 7, 1987, she filed for disability benefits with the Secretary. She explained:
 
 
 9
 I tried, and wanted to work, but condition seemed to worsen. I can still not sit for more than 2 hrs. in a straight position--Must recline. Bending or reaching to file even causes much pain....
 
 
 10
 While awaiting the Secretary's decision on her disability claim, she returned to Dr. Kepley on February 22, 1988. Dr. Kepley took the first x-rays of Jones' spine in nearly three years. On this basis, he determined that 60 to 70 percent of her fourth thoracic vertebrae had collapsed in the interim. Moreover, he found that her upper back was contorted by thoracic kyphosis into a "hunchback." He noted that any "flexion of the spine" was "very painful."
 
 
 11
 While Dr. Kepley informed the Secretary of his new diagnosis, it still denied the application on March 9, 1988. On April 15, 1988, Jones moved for reconsideration of the decision, explaining:
 
 
 12
 [T]he pain in my upper back is so severe I could not hold a full time job. A fracture in the spine was misdiagnosed & mistreated--healed improperly.
 
 
 13
 Her request was denied; she then moved for an administrative hearing.
 
 B. The Administrative Hearing
 
 14
 The administrative hearing was held on February 9, 1989. Jones was the only person to testify, stating that her back "hurts all the time;" the pain was relieved only by lying down with an ice pack pressed against her back. She also testified that she could not sit down in a straight chair for more than ten minutes before experiencing a "great deal of discomfort." As for secretarial work,
 
 
 15
 I would type about 10 minutes and that was it and I went laying down. I mean it was, I was actually in tears by the time I got done doing it ... because my back hurt so much, can't sit that straight.
 
 
 16
 Her testimony comported with a condition of a very painful nature. Experiencing severe pain when she stood or sat down for any extended period of time, Jones spent her waking hours in a reclining position. As she had no assistance, she bathed herself with the use of an apparatus attached to the bathtub, and prepared meals in a microwave. She said that her daughter visited her once a week, and together they shopped for groceries. Otherwise, she lived a sedentary life. She rarely left her apartment because she did not drive, there was no public transportation nearby, and even walking a short distance was difficult. In the winter, she tried to stay inside for she was "scared to death of walking on ice."
 
 
 17
 In addition to her own testimony, medical reports were submitted into evidence. Dr. Kepley opined that she was suffering from the collapse of 60 to 70 percent of her vertebrae and thoracic kyphosis. Dr. Apte, who regularly saw Jones for other ailments, reported that the patient consistently complained of back pain. He added that she also suffered from chronic migraine headaches, mild hypothyroidism, and mild hypertension. His associate, Dr. Susan Yeahley, conducted her own examination, and agreed with Dr. Apte's diagnosis. There was no countervailing medical testimony.
 
 
 18
 Nonetheless, the administrative law judge denied benefits, giving the following reasons for his determination:
 
 
 19
 Three separate attending physicians, Doctors Apte, Kepley and Yeahley indicate in effect, that claimant is "unemployable because of the fracture of the fifth dorsal vertebra, migraine headaches and essential hypertension. However, the objective findings they offer in support of their condition [sic] concerning claimant's employability are scant, and fail to support either their glib opinions or claimant's allegations."
 
 
 20
 Jones requested review by the Appeals Council. For this purpose, Dr. Kepley re-examined her and provided the following report:
 
 
 21
 Thus far, everything we have done has failed to relieve her symptoms. The spinal orthosis which was recommended and ordered did not control symptoms and was not well tolerated by the patient. She is also having difficulties with her right knee and left ankle, both of which are contributing to the back problem and making it extremely difficult for her to do any activities which require standing, walking or even sitting for any length of time. We have recommended that she utilize a cane or walker on a consistent basis, as being the only means to support the spine for upright activities. She has also been continued on Ibuprofen medication for pain relief and as an anti-inflammatory. We expect that her condition will continue on a permanent basis as there is no other medical or surgical remedy that can help her out of this current dilemma. (emphasis added).
 
 
 22
 The Appeals Council rejected Dr. Kepley's report stating:
 
 
 23
 Dr. Kepley does not describe the nature of the difficulties or give any clinical findings to support his opinion that you should utilize a cane or walker. For these reasons this report cannot serve as a basis for changing the Administrative Law Judge's conclusions.
 
 
 24
 The Appeals Council refused review, and, hence, the administrative law judge's determination became the final decision of the Secretary on August 31, 1989. Jones then turned to the district court for relief; when it dismissed her complaint, this appeal followed.
 
 II. REVIEW OF NON-DISABILITY FINDING
 
 25
 Congress has determined that "[T]he finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (1982). The Supreme Court has defined substantial evidence as "more than a mere scintilla ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 535 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing Consolidated Edison v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)). This court must examine the entire record to determine if the Secretary's findings are supported by substantial evidence.[5] After examining the record, we find that the Secretary erred for the following reasons.
 
 A. Disablement and Pain
 
 26
 The Social Security Act provides that, in considering whether a person is disabled under Title II, "[o]bjective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques must be considered in reaching a conclusion as to whether the individual is under a disability." (emphasis added). 42 U.S.C. § 423(d)(5)(A). This requirement equally applies to disability determinations for the purpose of supplemental security income benefits. Id. § 1382c(a)(3)(G).
 
 
 27
 Under this standard, our evaluation of subjective complaints of disabling pain is two-pronged. We must determine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine:
 
 
 28
 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or,
 
 
 29
 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."
 
 
 30
 Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir.1986).
 
 
 31
 We find that the Secretary has not met this standard. First, the agency failed to follow its own guidelines in evaluating the severity of Jones' subjective complaints of pain. Second, the Secretary compounded this error by wholly discounting the medical evidence indicating that her underlying medical condition was of such severity that it reasonably could have been expected to produce the alleged disabling pain.
 
 B. The Social Security Guidelines
 
 32
 The measure of an individual's pain cannot be easily reduced to a matter of neat calculations. There are no x-rays that can be taken that would objectively show the precise level of agony that an individual is experiencing. Hence, in evaluating the intensity and persistence of pain, both physicians and laymen alike, must often engage in guesswork. The Secretary's own guidelines acknowledge the most inexact nature of this evaluation:
 
 
 33
 Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.
 
 
 34
 There are situations in which an individual's alleged or reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical evidence alone.
 
 
 35
 In such cases, reasonable conclusions as to any limitations on the individual's ability to do basic work activities can be derived from the consideration of other information in conjunction with medical evidence.[6]
 
 
 36
 We find that the Secretary has fallen short of these standards. First, the objective medical evidence revealed that Jones suffered muscle atrophy, reduced spinal motion, muscle spasms, and motor disruption. From these "reliable indicators," it was reasonable for the Secretary to assume that Jones was experiencing intense pain. Nonetheless, the Secretary did not do so. In this regard, the Secretary erred. Second, assuming, arguendo, that there was a gap between Jones' reported symptoms and the objective evidence, the Secretary was required to consider other information in conjunction with the medical evidence. Here, the Secretary did not do so, cutting short its inquiry at the point where, in its opinion, objective medical evidence ended, and then wholly discounted evidence to the contrary.
 
 
 37
 Here, the other evidence pointed in the other direction, toward a finding of disability. The unanimous opinion of the treating physicians was that she was disabled. There were no contrary medical opinions.[7] The medical records show the persistence and severity of Jones' symptoms.[8] Moreover, Jones' testimony comported with the medical evidence.[9] In fact, there was no countervailing evidence.
 
 
 38
 Clearly, the Secretary's complete devaluation of the evidence supporting the existence of Jones' ailment was in error. Upon remand, the evidence, as a whole, should be evaluated in accordance with the Secretary's own guidelines.
 
 C. The Objective Underlying Condition
 
 39
 The Secretary compounded these errors by wholly discounting objective medical evidence of an underlying medical condition that was of such severity that it reasonably could have been expected to produce the alleged disabling pain.
 
 
 40
 The objective medical evidence indisputably showed that she was suffering from the collapse of 60 to 70 percent of her fourth vertebrae. This finding was established by x-rays. This evidence "must be considered in reaching a conclusion as to whether the individual is under a disability." (emphasis added). 42 U.S.C. § 423(d)(5)(A). Nonetheless, the Secretary failed to consider whether this objectively-established medical condition is of such a severity that it reasonably can be expected to produce the alleged disabling pain.
 
 
 41
 For the reasons set forth above, we vacate the judgment and remand to the Secretary for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Ms. Jones originally had x-rays taken on the day of her fall at St. Thomas Hospital's emergency room. She alleges that she was told by the emergency room personnel that the x-rays did not show a fracture of the spine. Afterward, she "could not move without help." She then went to Dr. Apte and his associates, and "they didn't read hospital x ray [sic] and treat [it] as sprain."
 
 
 [2]
 Dr. Apte recorded the deterioration of Jones' condition through the month of January. On January 3, 1985, he wrote that she "still had tenderness on the mid-thoracic spine, also pain on movement of spine." By January 11, 1985, he started to measure her ability to flex from the spine. On that date, she could flex thirty-six degrees. Two weeks later, on January 25, 1985, she could only flex eight degrees, and by February 1, 1985, she could only flex six degrees
 
 
 [3]
 The record provides only these sketchy facts. In response to Jones' complaints, Dr. Robert Kepley reported that he would prepare a letter so that she might obtain an apartment where she would not have to climb up and down the stairs. Nonetheless, by the time of Jones' administrative hearing in 1989, she still lived in the same apartment, apparently awaiting an opening in her apartment complex
 
 
 [4]
 The record provides little information as to how Jones supported herself during her years of unemployment. There are only two statements on this matter. First, in her first application for disability benefits, she wrote that she had turned to her daughter for financial support, and was prepared to apply for welfare and food stamps. Second, at her administrative hearing, she testified that she was now subsisting on an income of $149 each month from "general relief," supplemented by food stamps
 
 
 [5]
 Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984); Houston v. Secretary of Health and Human Services, 736 F.2d 365, 366 (6th Cir.1984); Kirk, 667 F.2d at 536 n. 69; Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980); Futernick v. Richardson, 484 F.2d 647, 648 (6th Cir.1973)
 
 
 [6]
 Proposed Social Security Ruling 88-13, Title II and XVI: Evaluation of Pain and Other Symptoms Fed.Reg. 53,178 (1988)
 
 
 [7]
 We note that it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference. See, e.g., King v. Heckler, 742 F.2d 968 (6th Cir.1984); Lashley v. Secretary of Health and Human Services, 708 F.2d 1048 (6th Cir.1983); Colwell v. Gardner, 386 F.2d 56 (6th Cir.1967); Miracle v. Celebrezze, 351 F.2d 361, 378 (6th Cir.1965); Hall v. Celebrezze, 314 F.2d 686 (6th Cir.1964)
 
 
 [8]
 The Secretary apparently places significant weight on the failure of her physicians to recognize the severity of her pain or the existence of an underlying condition. Certainly, she should not be penalized for her physicians' past diagnostic errors. Regardless, the record shows the persistence and severity of Jones' condition
 
 
 [9]
 This court has insisted that the Secretary give the appropriate weight to lay testimony supported by the medical evidence. See, e.g., Lashley, 708 F.2d at 1054