78 F.3d 584
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Silas R. GARLAND, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services
Defendant-Appellee.
 No. 94-6647.
 United States Court of Appeals, Sixth Circuit.
 March 5, 1996.
 
 Before: MARTIN and RYAN, Circuit Judges; and KATZ, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff, Silas Garland, applied for Social Security Disability Benefits on March 11, 1983, claiming disability onset as of November 1, 1981, due to disabling pain caused by migratory polyarthritis. His application was denied initially and on reconsideration. Following an administrative hearing, the Administrative Law Judge ("ALJ") issued a decision finding that Garland had been disabled since March 1, 1983, but not prior thereto. The Appeals Council denied review, and the district court upheld the Secretary's decision.
 
 
 2
 In 1991, Garland was notified that he was a class member under Samuels v. Heckler, 668 F.Supp. 656 (W.D.Tenn.1986), and was entitled to have his claim readjudicated. Following a second administrative hearing, the ALJ denied Garland's application for disability insurance benefits, and the district court affirmed the Secretary's decision. Garland now appeals, claiming that the Secretary's denial of his application is not supported by substantial evidence. We find that the record does not contain substantial evidence to support the denial of Garland's claim and reverse with instructions that plaintiff be awarded disability insurance benefits.
 
 I.
 A.
 
 3
 To demonstrate why we think there is not substantial evidence to support the Secretary's denial of benefits, it is necessary that we set out, at length, the evidence details of Garland's extensive medical history. Garland was fifty-five years old when he filed his application for benefits. He has an eighth grade education and a limited ability to read. He cannot read a newspaper, and his wife generally reads to him any correspondence directed to his attention.
 
 
 4
 Garland has a well-documented work history. He worked in construction most of his life as a carpenter, pipefitter, and as a heavy equipment operator. In 1968, he joined the Tennessee Valley Authority as a truck driver, and was laid off in 1972. He later worked for the Lawrence County Highway Department running a tractor vater for almost two years. He had to quit his job with the highway department because his legs would "just give away" on him and he needed the use of both of them to maneuver the brakes in the truck. After quitting this job, he started "logging," an activity that he undertook off and on throughout his work history. He was a self-employed logger between 1972 and 1981, at which time he alleges he became disabled.
 
 
 5
 The medical history reveals that Garland's medical problems began to be officially documented in April 1974, when he was admitted to the hospital due to pain in his back. Hospital records show that Dr. V.H. Crowder, Jr. examined Garland and diagnosed osteoarthritis of the lumbar spine with degenerative disc disease. Dr. Crowder found that Garland had a "little" pain when he moved his legs, limitation in motion of his back, and muscle spasms in the lumbar region. It was his opinion that Garland was at this time "disabled." The radiologist, Dr. Lawrence R. Nickell, confirmed Dr. Crowder's diagnosis, finding an L-4, L-5 intervertebral disc disease with secondary osteoarthritis.
 
 
 6
 Garland's attending physician, Dr. Laurence B. Molloy, first examined him in June 1974. Two months later, in August 1974, he diagnosed the plaintiff with having sciatic root compression, probably due to a herniated intervertebral disc. Garland complained of continuing and consistent pain, so Dr. Molloy referred him to an orthopaedic surgeon. After considering the orthopedist's report, Dr. Molloy concluded that Garland would probably need an exploratory laminotomy for decompression purposes. Based on Garland's medical history, work history, and educational background, Dr. Molloy concluded, as Dr. Crowder had, that the plaintiff was "temporarily and totally disabled to earn a gainful living" in August 1974.
 
 
 7
 Dr. Eugene M. Regen, Jr., the orthopaedic surgeon, reported in 1974 that Garland's pain persisted in "the left lumbosacral region." His report confirmed the findings of the radiologist, stating that Garland had a "[l]ow back mechanical disorder, probably longstanding disc syndrome with local arthritic changes about it."
 
 
 8
 In October 1974, Dr. Molloy determined that Garland had developed early migratory polyarthritis. Plaintiff's pain was persistent and had not subsided despite the different medications he was taking. By December 1974, Dr. Molloy found Garland to have developed arthritis in both knee joints; and by March 1975, Garland had developed additional pain in both knee joints, in the right elbow joint and the right radiohumeral bursa, the left elbow joint, and the right shoulder. Dr. Molloy also found that Garland had a malunion of the right radius and ulna due to a poorly-healed fracture suffered in 1951; this condition prevented Garland from extending his arm beyond 160 degrees due to pain. X-rays confirmed these findings. Because of Garland's inability either to sit or to stand for long periods of time and because of the pain, Dr. Molloy concluded once again that Garland was "disabled."
 
 
 9
 Garland was seen again by Dr. Molloy in 1976 when he went to the hospital because of pain from his migrating polyarthritis, and also due to an urinary tract infection. Garland did not see Dr. Molloy again until May 1981, at which time the doctor found him to be experiencing left chest pain radicular in character, involving the left knee. The last time Dr. Molloy, who is now deceased, saw Garland was in February 1983 when plaintiff was admitted to the hospital to determine whether his arthritis had evolved into rheumatoid arthritis. Garland came to the hospital complaining of intense pain in the right elbow, right knee, ankle, shoulder, and back. During this hospital stay, Dr. Molloy found that Garland's arthritis had migrated into his back and left shoulder. The radiologist confirmed moderate degenerative arthritic changes and degenerative disc disease changes in the L-4 and L-5 level. In November 1983, Dr. Molloy again stated that Garland was totally disabled, just as he had been in March 1975, eight years earlier.
 
 
 10
 Dr. Calvin L. Calhoun, hired by the Secretary to examine Garland, largely confirmed the findings Dr. Molloy had made nine years earlier. His report indicates that Garland had polyarthropathy, possibly rheumatoid, chronic lumbosacral myositis, secondary to degenerative arthritis. Dr. Calhoun also confirmed the malunion of Garland's right forearm, and migratory polyarthritis and concluded that "[m]igration of arthritic discomfort may well limit sustained physical activity for carrying out gainful employment."
 
 
 11
 Dr. Calhoun also confirmed Garland's weak grip in his right hand, his weak knees, and that his chronic polyarthropathy had been a long-standing condition. He also confirmed that Garland's condition was not due to any recent events, but rather was a chronic condition existing for over ten years. None of Dr. Calhoun's findings were in conflict with, or contradicted by, the diagnoses made by Drs. Molloy, Crowder, Nickell, and Regen.
 
 B.
 
 12
 During the administrative hearing, Garland testified that he had not seen many doctors in the period between 1976 and May 1981 because he had financial difficulties due to being unemployed and therefore could not afford to pay his doctor bills. However, after being approved for Medicaid, Garland sought medical treatment and received cortisone shots on a monthly basis.
 
 
 13
 Garland testified that he had been in pain for many years, and that his condition progressively worsened. His pain reached the point, he stated, where he had to stop logging altogether because he could no longer "do anything." He was in pain. His legs would "give out" on him. Lifting even light weight burdens would strain and hurt his back. His condition was such, as far back as 1975, that he had to hire a young man to help him log because he no longer could do it himself. And sometime before 1981, Garland had to hire a second person to assist in the logging business because he could no longer assist himself. Garland quit logging altogether in 1981.
 
 
 14
 Garland testified that he had had problems carrying any significant amount of weight due to the poorly-healed fracture in his right arm. And by November 1, 1981, the arthritis "was all over" his body: in his legs, arms, and shoulders, with the resulting pain being felt mostly in his hips and back. The pain sometimes would be sharp, but most of the time it would be "an old ache all the time." His fingers, hands, and back would swell. He slept on a heating pad, and although he took prescription medication and aspirin, "nothing seemed to help [the pain] too much."
 
 
 15
 In addition to being unable to work since prior to 1981, Garland also had to give up his favorite pastimes. Despite being an avid hunter all his life, he gave up hunting and fishing because the pain made these activities prohibitive.
 
 
 16
 Garland's wife testified at the hearing that she had seen plaintiff in pain repeatedly. She testified that after doing a "little" repair work on the children's bikes, "[Garland] wouldn't be able to get back up off the ground without crawling somewhere where he could pull himself back up."
 
 
 17
 Mrs. Garland told the ALJ that in 1977 the family had to sell the cattle they owned because the plaintiff could no longer drive the tractor, nor could he harvest corn. They also found it necessary to sell their horses because Garland could no longer care for them.
 
 
 18
 On many occasions Mrs. Garland witnessed her husband's inability either to sit or stand for extended periods of time. Garland could not attend his children's school events without getting up from his chair and walking around every so often. He would do the same thing at church. And, he could not watch television for more than thirty minutes at a time. Finally, Mrs. Garland stated, giving up all the things he enjoyed doing, in addition to being unable to work, affected Garland emotionally.
 
 
 19
 Garland's brother also testified to the disabling nature of Garland's pain. He stated that during the many trips in which he drove Garland to the doctor, he repeatedly had to stop the car to allow plaintiff to get out and stretch. Garland simply could not sit in the car for long periods of time without the pain setting in. He also verified that Garland had to hire help to do the logging, and that he quit fishing and hunting due to the pain.
 
 
 20
 Finally, a vocational expert testified at the hearing. He categorized Garland's past relevant work as unskilled and semi-skilled, medium to heavy, and with non-transferable skills. On the basis of the hypothetical posed by the ALJ, which assumed a person who could do "a full range of light work," the expert testified that a person of Garland's age and experience, "[w]ith no other impairments," would be able to work at unskilled, light assembly work. According to the expert, Garland would be able to work as a security guard, or as a messenger, or as a retail cashier. However, the expert testified that assembly work would require either sitting or standing and using primarily the hands and upper extremities.
 
 
 21
 The expert clarified, however, that if a person had pain that was severe enough to impair concentration, or if it was persistent, the condition would eliminate most of the jobs he testified plaintiff would be able to undertake.
 
 C.
 
 22
 The ALJ concluded on the basis of the foregoing evidence that Garland was not disabled within the meaning of the Social Security Act during the relevant time period of November 1, 1981, through December 31, 1981. He found that the "evidence of record in its entirety fail[ed] to support a finding" that Garland became disabled on November 1981. He concluded that "the claimant did not experience pain or other symptoms of a disabling level of severity during the relevant time period...." He also concluded that Garland's impairments "did not prevent him from performing his past relevant work" from November through December 1981. That is, the ALJ concluded that although Garland may not have been able to work as a logger, he could have worked as a truck driver or as a heavy equipment operator.
 
 
 23
 Although the ALJ referenced Dr. Calhoun's report, he discounted it because the examination was performed in 1984, three years after the alleged onset of disability. He also discounted the medical records Dr. Molloy prepared in 1974 and 1975 because the evidence showed that Garland had engaged in substantial gainful activity until 1977. The ALJ found that "Dr. Molloy's own treatment records and the other evidence of record fail to support his subjective opinion of disability." The ALJ found that Garland had not sought medical treatment despite his "subjective complaints" of pain, nor had he voiced to medical personnel "musculoskeletal complaints." Despite his complaints, the ALJ found, Garland continued "driving, visiting with other people, and occasionally hunting into 1983."
 
 
 24
 Finally, having determined that Garland could have performed "at least medium work," the ALJ found dispositive the vocational expert's testimony that Garland could have performed a variety of jobs available in the national economy, including security guard, unskilled retail cashier, messenger, and unskilled light assembly worker. The ALJ concluded that even if Garland could not have performed his past relevant work, he could have performed "light" work, under which category all the jobs mentioned by the expert fall.
 
 
 25
 The magistrate judge affirmed the Secretary's decision, finding there was substantial evidence to support it. The district court adopted the magistrate's report. Plaintiff then filed this timely appeal.
 
 II.
 
 26
 Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive if they are supported by substantial evidence. Murphy v. Secretary of Health & Human Servs., 801 F.2d 182, 184 (6th Cir.1986). Substantial evidence means more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 535 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).
 
 
 27
 In deciding whether substantial evidence supports the Secretary's determination, although her decision is conclusive even if substantial evidence might also support the opposite conclusion, Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986), and regardless of whether the court, as a trier of fact, would have decided the case differently, Elkins v. Secretary of Health & Human Servs., 658 F.2d 437, 439 (6th Cir.1981), the appellate court reviews the record "taken as a whole," and "must take into account whatever in the record fairly detracts from its weight." Young v. Secretary of Health & Human Servs., 925 F.2d 146, 147 (6th Cir.1990) (citations and internal quotations omitted). Thus, the reviewing court may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984).
 
 III.
 
 28
 Garland contends that the record does not contain substantial evidence to support the ALJ's denial of disability insurance benefits. He argues that the Secretary failed properly to apply social security regulations regarding determinations of pain; improperly discounted the medical evidence of record; offered no reason to discredit his and his family's testimony with respect to his disabling pain; and the record as a whole fails to support a finding that he could do a full range of medium or light work during the relevant time period. We agree.
 
 A.
 
 29
 Disability insurance benefits are available only to those individuals who can establish "disability" within the terms of the Social Security Act. 42 U.S.C. § 423(d)(1)(A). The plaintiff bears the ultimate burden to establish an entitlement to benefits by proving the existence of a disability that arose prior to the expiration of the claimant's insured status. 42 U.S.C. § 423; Hardaway v. Secretary of Health & Human Servs., 823 F.2d 922, 926 (6th Cir.1987). Specifically, the claimant must show that he is unable to engage in any substantial gainful activity by reason of any "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A).
 
 
 30
 To determine whether a claimant has met his burden of establishing disability, the ALJ must follow a five-step sequential process. 20 C.F.R. §§ 404.1520 and 416.920.
 
 
 31
 First, he must determine whether the claimant is currently engaged in substantial gainful activity; and if he is, the claimant will be found "not disabled" and the proceeding is at an end.
 
 
 32
 Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine on the basis of medical evidence whether the claimant has a severe impairment, defined as one which "significantly limits ... physical or mental ability to do basic work activities." If the claimant does not have a severe impairment, then he will be found not disabled.
 
 
 33
 Third, if the ALJ determines that claimant has a severe impairment that meets the duration requirements imposed by the regulations, or is one specifically listed in the regulations, then the claimant will be found disabled without consideration of vocational factors.
 
 
 34
 However, if the impairment does not preclude the claimant from performing his past relevant work, then he will be found not disabled.
 
 
 35
 Finally, if a claimant's impairment is so severe as to preclude him from engaging in his past relevant work, but is not so severe as to render him statutorily disabled, then the burden shifts to the Secretary to establish claimant's residual functional capacity to engage in substantial gainful activity in the national economy. 20 C.F.R. § 404.1520; Shelman v. Heckler, 821 F.2d 316, 320 (6th Cir.1987) (citations omitted).
 
 
 36
 Garland's impairment is of a musculoskeletal nature. To satisfy the burden of the first sequential step, he had to establish a disability that fell within the listed impairments found in 20 C.F.R., Subpart P, Appendix 1. However, because his rheumatoid arthritis had not been diagnosed as of November 1, 1981, his impairment did not reach a level of severity as to render him disabled within the meaning of the Social Security Act. Nonetheless the regulations mandate that when the claimant is not engaged in substantial gainful activity at the time of filing the application, the Secretary must assess his residual functional capacity to engage in other gainful activities, the fourth step in the sequential process. SSR 82-51 (1982).
 
 
 37
 In assessing a claimant's residual functional capacity, the ALJ must determine whether the claimant can perform his past relevant work. If he can, then he will be rendered not disabled. However, if his impairment precludes him from performing his past relevant work, then the burden shifts to the Secretary to establish that claimant is capable of performing substantial gainful activity in jobs existing in the national economy, taking into consideration his age, education, job experience, and functional capacity to work. See 42 U.S.C. § 423(d)(2)(b); SSR 83-10 (1983); Abbot v. Sullivan, 905 F.2d 918, 923 (6th Cir.1990).
 
 
 38
 In this case, the ALJ determined that Garland was capable of performing both "medium" and "light" work, and that he could perform his past relevant work as a truck driver. However, the record is devoid of any evidence supporting the conclusion that Garland could engage in sustained gainful activity in November 1981, much less that he could perform his past relevant work as a truck driver or heavy equipment operator. A fair review of the record indicates that not only did the ALJ ignore relevant facts, but made a decision to deny benefits on the basis of factual determinations that were in conflict with the evidence.
 
 
 39
 No evidence supports the conclusion that Garland could perform "light" or "medium" work. There are statutory definitions that apply to each category of work capabilities. SSR 83-10. Each level is defined according to the job's requirements regarding sitting, lifting, standing, walking, carrying, pushing, and pulling. Id. "Light work" is defined as one with the requirement of
 
 
 40
 lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor grader operator, and road-roller operator.... Relatively few unskilled light jobs are performed in a seated position.
 
 
 41
 ... [T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday....
 
 SSR 83-10. And "medium work" is defined as
 
 42
 lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday.... Use of the arms and hands is necessary to grasp, hold, and turn objects....
 
 
 43
 The considerable lifting required for the full range of medium work usually requires frequent bending-stooping.... Flexibility of the knees as well as the torso is important for this activity.... [T]here are a relatively few occupations ... [that] are performed primarily in a sitting position.... In most medium jobs, being on one's feet for most of the workday is critical....
 
 
 44
 Id. In determining whether a claimant's ability permits him to perform a job that falls within one of these categories, it is the responsibility of the ALJ to identify the pertinent evidence from medical and nonmedical reports which leads him to assess a claimant's residual functional capacity. SSR 85-16 at 2. No such evidence is mentioned in the opinion. Indeed, there is no evidence from which such a conclusion could be derived. No medical evidence supports a finding that Garland could have walked or stood for six hours in an eight-hour work day, five days a week. Nor does the evidence support a finding that Garland could have "stooped," bent, flexed, or carried between twenty and fifty pounds on a regular basis, which is what "light" and "medium" work requires according to the regulations.
 
 
 45
 The ALJ stated that Garland had continued logging and hunting through 1983. However, the evidence is otherwise. Garland stopped logging and hunting before November 1981. Indeed, by 1981 he had stopped all activities altogether, and he had two people working for him in the logging business. Garland established that he hadn't been able to drive a truck since 1977, when he quit his job with the Lawrence County Highway Department. His wife stated that they had to sell their horses and cattle in 1977--four years before the alleged onset of disability--because Garland could no longer drive a truck, nor tend to the horses. There is nothing in the record to cast doubt on the credibility of this statement. The fact that Garland had "visited with other people," "drove," and "occasionally hunted" after 1975 is not substantial evidence supporting a decision that Garland could engage in sustained gainful activity.
 
 B.
 
 46
 The ALJ also improperly discounted the medical evidence offered by Drs. Crowder, Calhoun, and Molloy to determine that Garland could perform his past relevant work as a truck driver or heavy equipment operator or, alternatively, could perform "light" work in those jobs identified by the vocational expert. It is well-settled in this circuit that a treating physician's opinion, when based on objective evidence, is accorded significant weight. And, if uncontradicted, the physician's opinion is entitled to complete deference. See, e.g., King v. Heckler, 742 F.2d 968 (6th Cir.1984); Lashley v. Secretary of Health & Human Servs., 708 F.2d 1048 (6th Cir.1983). Indeed, where the physicians of record have an unanimous opinion as to a claimant's disability, the records show a persistence and severity of the symptoms alleged, the claimant's testimony comports with the medical evidence and there is no countervailing evidence, then a finding of disability might be in order. See Jones v. Secretary of Health and Human Servs., 945 F.2d 1365, 1370 (6th Cir.1991). In this case, there is no conflicting medical testimony. All the physicians agreed that Garland had migratory polyarthritis since at least 1975. X-rays confirmed this condition on repeated occasions. There is no reason why the opinions of the physicians mentioned were not accorded complete deference.
 
 
 47
 The ALJ also discounted Dr. Calhoun's diagnosis on the grounds that it was made in 1984, three years after the alleged onset of disability. However evidence of a medical condition after the termination of eligibility status must be considered to the extent that it casts light on claimant's health before that date. Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir.1988) (citing Martonik v. Heckler, 773 F.2d 236, 240-41 (8th Cir.1985)). Thus, the critical date is the date of onset of disability, not the date of diagnosis. Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 304 (6th Cir.1988).
 
 
 48
 Although the Secretary is correct in pointing out that the decision of the ALJ in 1984 establishing an onset date of disability of March 1983 is not currently on appeal, it is certainly not irrelevant. Because this case is being readjudicated under Samuels, the entire record is part of the proceeding and can be used to evaluate the underlying facts. The 1984 decision is relevant in that the ALJ made a finding of complete disability as of March 1983, but not before, on the basis of the same medical evidence presented to support a disability onset date of November 1, 1981. The fourteen-month period between November 1981 and March 1983 shows no medically significant events that would justify a finding of disability with respect to one date and not the other. As the Secretary's own independent consultant stated, Garland's medical condition was of a long-standing nature. Indeed, Dr. Calhoun stated that there were no medical events that could have occurred between November 1981 and March 1983 that would have caused Garland's condition to reach a disabling level. Although his ailment is of a progressive nature, arbitrarily to decide that he was disabled in March 1983 but not in November 1981 is not consistent with the medical evidence, and indeed, it is in conflict with it.
 
 
 49
 Finally, the ALJ improperly discredited Garland's allegations regarding the onset date of disability. Social Security Regulation 83-20 demands that the claimant's onset date be adopted if it is consistent with all the evidence available. SSR 83-20; Willbanks, 847 F.2d at 304. And, when a claimant suffers from a chronic and long-standing condition, medical findings and conditions subsequent to the onset of disability are probative of the medical condition existing prior to that time. See Ellis v. Schweicker, 739 F.2d 245, 247 (6th Cir.1984). In this regard, it is improper to base a decision on one single piece of evidence and to disregard other pertinent evidence. Hephner v. Matthews, 574 F.2d 359, 362 (6th Cir.1978). And in the case of slowly progressing impairments, it is not necessary for a claimant to establish a listed severity before onset can be established. Blankenship v. Bowen, 874 F.2d 1116, 1122 (6th Cir.1989). All the evidence presented by Garland amply supported his claimed onset of disability on November 1, 1981, and there is no factual basis to ignore this date.
 
 C.
 
 50
 The ALJ also erred in completely discarding Garland's testimony, that of his family members, and of his attending physicians, with respect to the level of pain experienced by Garland. Garland met both prongs of the Duncan test for establishing disabling pain: he offered evidence of his underlying medical condition, and the medical condition can objectively be expected to give rise to pain. See Duncan v. Secretary of Health & Human Servs., 801 F.2d 847, 853 (6th Cir.1986).
 
 
 51
 The ALJ discounted the evidence that showed that Garland's pain was of a disabling nature. However, in this area credibility determinations should not be discarded lightly and should be accorded deference. Houston v. Secretary of Health & Human Servs., 736 F.2d 365, 367 (6th Cir.1984). Garland had sought medical attention for his pain for almost six years prior to applying for disability benefits. The various doctors' reports show that Garland was consistent in his complaints about pain, its nature and location, and the limitations it imposed on him. The ALJ's finding that Garland never expressed to medical personnel his "musculoskeletal" ailment and the corresponding pain is clearly in conflict with the record. In addition, there is no medical testimony supporting the ALJ's conclusion that Garland's condition could not give rise to disabling pain. Moreover, he offered his own testimony, which was entirely consistent with the testimony he gave in the 1983 hearing, and he offered the testimony of his wife and of his brother. He gave no inconsistent statements, and his activities since 1975 are consistent with having disabling pain. In short, there was no legitimate reason to completely discount his allegations of pain.
 
 
 52
 The ALJ was convinced that the objective medical evidence did not support Garland's "subjective" allegations of pain. However, subjective complaints of pain or other symptoms may support a claim of disability. Blankenship, 874 F.2d at 1123. Objective evidence of pain is not necessarily required. Id. To be sure, there are no x-rays that can measure the level of severity an individual is experiencing with pain--pain cannot be reduced to a neat set of calculations. Jones, 945 F.2d at 1369. Moreover, where there are no valid reasons for disbelieving a claimant's allegations of pain, such as where there are no inconsistencies or conflicting testimony regarding complaints to doctors with respect to the pain, a finding of lack of credibility is not warranted. See Blankenship, 874 F.2d at 1124. We find that there is substantial evidence in the record to support Garland's allegations of pain, and the ALJ's determination to the contrary is supported by no evidence.
 
 D.
 
 53
 Garland also argues that the evidence does not support a finding that he could perform the various jobs testified to by the vocational expert. We agree. The ALJ's reliance on the available jobs testified to by the expert was contrary to law. If the factfinder evaluates a claimant's residual functional capacity based in part on the testimony of a vocational expert, the hypothetical questions posed to the expert must reflect "precisely" the specific exertional and nonexertional limitations of the claimant. Varley v. Secretary of Health & Human Servs., 820 F.2d 777, 779 (6th Cir.1987). If the Secretary relies on the vocational expert to prove the existence of jobs that the claimant can perform, "the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir.1994) (citation omitted).
 
 
 54
 The hypothetical presented to the expert was faulty in that it started with the assumption that Garland could perform a full range of "light" work. However, as we have explained, the social security regulations describing what light work entails when contrasted to the medical and lay evidence presented in this case can only point to the conclusion that Garland could not possibly have performed any of the jobs comprising that category. To be sure, when the ALJ modified the hypothetical to include Garland's allegations of pain, the expert stated that there probably would be no available jobs for an individual with such limitations. However, the ALJ appeared to ignore this comment, and failed to mention it in his opinion.
 
 
 55
 Garland was fifty-five years old at the time of the hearing, with a limited education, an inability to read very well, and with a well-documented history of polyarthritis. The ALJ's conclusion that there was substantial evidence showing that Garland could drive a truck eight hours a day, drive heavy equipment, or engage in any of the other jobs the vocational expert mentioned was plainly unreasonable, in view of the undisputed medical evidence and other testimony in the case. On review of the entire record, we conclude that the Secretary did not carry her burden of showing that Garland had the residual functional capacity to perform substantial gainful activity.
 
 IV.
 
 56
 Finally, if this court determines that substantial evidence does not support the Secretary's decision, "the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Faucher v. Secretary of Health & Human Servs., 17 F.3d 171, 176 (6th Cir.1994). That is, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." Faucher, 17 F.3d at 176.
 
 
 57
 There are no factual issues left to be resolved in this case. There is an abundance of proof that Garland was disabled on November 1, 1981, and there is no significant evidence to the contrary. Accordingly, we direct the district court to remand for an award of disability insurance benefits.
 
 V.
 
 58
 We REVERSE the decision of the district court, VACATE its judgment, and REMAND with instructions to remand the case to the Secretary for an award of benefits.
 
 
 
 *
 The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation