110 F.3d 64
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Betty L. ISAAC, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 96-5230.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1997.
 
 Before: CONTIE, RYAN, and BOGGS, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 The Plaintiff, Betty Isaac, appeals from the district court's grant of summary judgment to the defendant, which affirmed the decision of an administrative law judge denying Social Security benefits to Isaac. Isaac claims that she is totally disabled by lower back pain and migraine headaches, and argues that the Secretary's determination is not supported by substantial evidence. We disagree, and will affirm.
 
 I.
 
 2
 Betty Johnson, born in September 1942, married Arthur Isaac in 1960. Arthur Isaac died in February 1971, leaving Betty Isaac a widow. Because Arthur Isaac was a wage earner within the meaning of the Social Security Act, his widow is eligible for Social Security disability benefits.
 
 
 3
 Isaac has a high school education, but no vocational or other training. Isaac had been working for four years as a nursing assistant at Riverview Manor Nursing Home in Prestonsburg, Kentucky when, in April 1992, she incurred a work-related back injury while "lifting a heavy woman in a somewhat unusual position." That was the first job Isaac had ever had, and she has had no jobs since then.
 
 
 4
 The injury resulted in "back and leg pain, particularly in the right leg." Following unsuccessful physical therapy, Isaac had back surgery in October 1992, but claims her condition did not improve as a result. She claims to have constant numbness in her right foot, which causes her problems with standing. In addition to her back pain, she suffers from migraine headaches, which began in approximately 1991 or 1992. She has on occasion--five or six times as of 1994--been hospitalized for pain from the migraines.
 
 
 5
 Since her accident, Isaac says, she does "[n]othing" beyond going to the doctor. Although her doctor has told her to walk half a mile a day, she is unable to do so every day. After she has walked a half mile, she has "a lot of trouble" with her right leg, and it feels "just like [she] can't use it--control it." She also has trouble sitting and standing, and claims that she can sit for only 20 to 25 minutes at a stretch, and can stand for only 15 to 20 minutes. She feels that she cannot lift more than five or ten pounds.
 
 
 6
 Isaac takes various medications for her pain. For her back, she takes Tylenol III twice a day, which she says relieves her pain "[f]or maybe an hour or something." She also takes a muscle relaxer and Motrin every day. The muscle relaxer, which she takes once in the morning and once at night, makes her dizzy for about an hour, during which time she just tries to sit down. Finally, she uses a TENS unit intermittently throughout every day, as well as a heating pad, which alleviate her pain somewhat. For her migraines, which occur "[a]bout every three weeks" and last all day, Isaac takes medication twice daily, although the medication has not reduced the number of migraines she gets. She also self-administers an injection whenever she feels a headache coming on. The injected medication makes her sleep for four or five hours immediately after taking it.
 
 
 7
 Isaac filed a claim in January 1993 for widows' insurance benefits under sections 202(e) and 223 of the Social Security Act, alleging disability due to her back injury and her migraine headaches. The claim was initially denied, and Isaac filed a request for a hearing.
 
 
 8
 At the ALJ hearing, the only two witnesses were Isaac and Donald Woolwine, a vocational expert. Woolwine knew nothing about Isaac except what he had read in her records. The ALJ presented Woolwine with two lengthy hypotheticals, the first of which asked the expert to
 
 
 9
 [a]ssume that I find from an exertional standpoint that the claimant has the exertional capacity to lift up to 20 pounds occasionally and 10 pounds on a frequent basis. That she is able to sit for six hours in an eight-hour day, and stand for six hours in an eight hour day, but only occasionally climb, stoop, kneel, crouch, and crawl. Assume that ... the claimant's impairments as described[ ] would prevent her from performing her past relevant work, which you indicated was as a medium to heavy level of exertion. Do you have knowledge of other jobs existing in significant numbers in one or more regions of the national economy during the period since April 5, 1992, which this individual could be expected to perform on a sustained basis?
 
 
 10
 Woolwine responded that he knew of jobs "in the light and sedentary work classifications," as follows:
 
 
 11
 There would be general office clerks of 2,000,000 on a national and 200,000 on region, the region being the states of Ohio, Kentucky, West Virginia. There would be inspectors of 300,000 on national, and 30,000 on region. There would be watch guards 70,000 [sic] on a national, and 7,000 on region. In the sedentary, there would be surveillance monitors of 20,000 on a national and 2,000 on a region. There would be inspectors of 100,000 on a national, and 10,000 on a region. And assemblers of 300,000 on a national, and 30,000 on region.
 
 
 12
 The ALJ then asked a follow-up hypothetical, incorporating Isaac's testimony about the extent of her pain and her functional limitations, to which Woolwine responded that "[t]here would be no light jobs" given those limitations, and that only 20% of the sedentary jobs--the inspector and surveillance-monitor positions--would be available.
 
 
 13
 In his subsequently issued decision, the ALJ concluded that "although the claimant's severe impairments preclude her from returning to her past work, other work exists which she could perform and, thus, she is not disabled." Although he concluded that Isaac had a "severe back impairment," he concluded that she "does not meet or equal a listed impairment." It was, therefore, necessary "to establish her residual functional capacity." To do so, he "evaluated her testimony regarding subjective complaints," and noted that at the hearing, Isaac "exhibited no obvious impairment nor signs of pain," although she did "beg[i]n to move about in her chair" as the hearing wore on. The ALJ then made a somewhat guarded finding about Isaac's credibility:
 
 
 14
 In determining the weight to be given to the claimant's testimony, I have considered the claimant's credibility as a witness. I find that her testimony was credibly presented. However, in addition to this subjective testimony of the claimant and the opinions of the physician, I have taken into consideration the claimant's appearance, demeanor and behavior at the hearing. Near the end of the hearing she was moving about some in her chair which was suggestive of discomfort, however, she did not stand and she did not exhibit any signs or indicia of severe pain. She did not exhibit any difficulty in walking and did not use any ambulatory assistance, although she claimed to use a cane at home most of the time.
 
 
 15
 (Emphasis added.) The ALJ also opined that he was "not especially persuaded that the claimant's testimony accurately presents her limitations or her residual functional capacity."
 
 
 16
 The ALJ then went on to consider the medical opinions, and concluded that the report of Dr. Singayao, one of Isaac's treating physicians, was not entitled to as great weight as that of Dr. Ravvin, Isaac's treating surgeon. Dr. Singayao assessed Isaac as only able "to perform a limited range of sedentary work and a very limited range of light work," and, specifically, limited to
 
 
 17
 occasionally lift[ing] and carry[ing] ten pounds, otherwise five pounds, that standing and walking was limited to four hours in an eight hour day at one hour intervals, and that she could sit four hours in an eight [sic] day at one hour intervals, could occasionally climb and balance but should never stoop, crouch, kneel or crawl[.]
 
 
 18
 The ALJ noted, however, that Dr. Singayao's most recent report "contains few medical findings," while "[t]he only other report by Dr. Singayao is the discharge summary ..., which reflects his efforts to deal with the claimant's pain prior to the surgery by Dr. Ravvin." The ALJ concluded, therefore, that "it is Dr. Ravvin who appears to be actually in a better position to determine the claimant's functional capacity." Dr. Ravvin indicated that Isaac "should not lift over 25 pounds or engage in repeated stooping and bending. He noted that the prognosis for return to work was not good but he saw no reason why she could not work." The ALJ also noted that Dr. Ravvin's assessment was "consistent with the assessment of functional capacity by the State Agency consultant," who had concluded "that the claimant has an ability to perform a limited range of light work."
 
 
 19
 The ALJ then summarized his findings as follows:
 
 
 20
 [I]t is my opinion that the State Agency medical consultant's assessment of functional capacity comes closest to accurately describing the claimant's capacities and limitations. Such assessment is consistent with the expressed view of Dr. Ravvin, the claimant's treating surgeon. Notwithstanding the fact that the claimant's testimony was seemingly credible and is considered to be the claimant's honest and sincere representation of her perception of her pain and limited function, I do not find such testimony sufficiently persuasive to compel me to the conclusion that her functional capacity is less than that assessed by the State Agency medical consultant[.]
 
 
 21
 Isaac then filed this action, where the district judge granted summary judgment in favor of the defendant. Isaac then filed this timely appeal.
 
 II.
 
 22
 In the Social Security context, this court accepts an ALJ's factual findings if they are supported by substantial evidence. See Smith v. Chater, 99 F.3d 780, 781 (6th Cir.1996) (citing 42 U.S.C. § 405(g)). This standard means "that a particular agency finding ... can be reversed only if a reasonable factfinder would have to reach another conclusion," that is, "if the evidence compels a conclusion other than the one the agency reached." Id. at 782 n. 3 (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)).
 
 III.
 
 23
 Isaac offers four arguments in support of her contention that the ALJ's ruling was not supported by substantial evidence. First, she points to the reports of various treating physicians, ranging in time from a few months prior to her surgery until the ALJ hearing, and contends that these reports constitute substantial medical evidence supporting a finding of disability, automatically entitling her to benefits. This argument obviously ignores the standard of review by which we are bound. If substantial evidence supports the ALJ's findings, we must affirm the resulting conclusion, even if we would have decided the matter differently in the first instance. See Smith, 99 F.3d at 781-82. Likewise, "even if substantial evidence also would have supported a finding other than the one the ALJ made," the ALJ's decision should not be reversed. Id. at 782.
 
 
 24
 Next, Isaac argues, the ALJ failed to give appropriate weight to Isaac's description of her pain, especially given that it was supported by objective medical evidence, and especially given what she contends was the ALJ's finding that her testimony was credible. To the extent the plaintiff means to contend that her subjective allegations of disabling pain are entitled to some preclusive effect, her contention is belied by existing case law. In the recent decision of Smith v. Chater, for example, we reversed a district court that had based its reversal of the ALJ's no-disability determination on a conclusion that "the ALJ erred in refusing to credit fully [the claimant's] allegations of disabling pain." 99 F.3d at 781. Thus, this court held that the ALJ's decision was in fact supported by substantial evidence, despite being contradicted by allegations of pain on the part of the claimant.
 
 
 25
 In short, there is no requirement in the statute, regulations, or case law that an ALJ automatically defer to a claimant's subjective account of her pain. Moreover, we do not read the ALJ's credibility assessment to be as positive an endorsement as Isaac would argue. While we confess that we find the ALJ's failure to be more straightforward to be understandably vexing to Isaac, he nonetheless made it sufficiently clear that he did not find her account of her pain to be persuasive. Isaac's accounts of pain were contradicted by the facts that the pain was controlled by relatively mild medication, such as Tylenol III, and in-home pain-relief devices, such as a TENS unit and a heating pad. Likewise, there was no objective medical evidence that identified a particular cause of the allegedly disabling pain. Furthermore, one of Isaac's treating physicians, Dr. Ravvin, found her functional capacity to be greater than what Isaac believed. Thus, the ALJ was certainly entitled to reject Isaac's testimony in this regard. Cf. Jones v. Secretary, HHS, 945 F.2d 1365, 1369 (6th Cir.1991).
 
 
 26
 This brings us to Isaac's next argument: that the hypothetical presented to the vocational expert failed to accurately reflect the evidence, making his opinion that Isaac could perform light jobs irrelevant. She contends that the second hypothetical, incorporating Isaac's subjective account of her limitations, was more complete, and thus was improperly disregarded by the ALJ, mandating reversal. This argument fails for the same reason that her immediately preceding argument fails: there is no requirement that the ALJ accept Isaac's subjective account of her pain, and Isaac points to no other flaws in the first hypothetical apart from its failure to incorporate her account of pain. Given that the ALJ did not find her account persuasive, and that he was entitled to do so, there was no error in his reliance on the vocational expert's answer to the first question.
 
 
 27
 Isaac's final argument is that the ALJ failed to give sufficient weight to the medical report of Dr. Singayao, her treating physician. She contends that the ALJ improperly relied on the reports of non-examining physicians retained by the state agency, as well as reports by Dr. Ravvin, her treating surgeon, that dated from prior to her surgery.
 
 
 28
 As a preliminary matter, we note that this latter claim is inaccurate. While some of Dr. Ravvin's reports predated Isaac's surgery, others were made afterward. The report primarily relied on by the ALJ, in which Dr. Ravvin stated that he "s[aw] no reason she could not work," was made in January 1993, several months after surgery.
 
 
 29
 Otherwise, we note our agreement with the plaintiff's general statement of law. "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir.1988). Thus,
 
 
 30
 [t]he medical opinion of the treating physician is to be given substantial deference--and, if that opinion is not contradicted, complete deference must be given. The reason for such a rule is clear. The treating physician has had a greater opportunity to examine and observe the patient. Further, as a result of his duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians. It is true, however, that the ultimate decision of disability rests with the administrative law judge.
 
 
 31
 Walker v. Secretary, HHS, 980 F.2d 1066, 1070 (6th Cir.1992) (citations omitted). If, however, the medical evidence is contradictory, then an ALJ may rest his conclusion on that other evidence. See id. In other words, "the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them." Hall, 837 F.2d at 276. Thus, because Dr. Singayao's opinion was contradicted by Dr. Ravvin's opinion, clearly, the ALJ was constrained to choose one or the other, even though both were entitled to deference, since both were opinions of treating physicians. Moreover, Dr. Ravvin's opinion was supported by additional evidence in the record, albeit the opinion of non-treating physicians. Under these circumstances, there was no error in the ALJ's crediting of Dr. Ravvin's opinion.
 
 IV.
 
 32
 AFFIRMED.