**Erma J. HILL, Plaintiff,**

v.

**Larry G. MASSANARI,[1] Commissioner of Social Security, Defendant.**

**Civil Action No. 00–2574–KHV.**

United States District Court,
D. Kansas.

July 3, 2001.

---

1. Larry G. Massanari became Commissioner of Social Security on March 29, 2001. The Court takes judicial notice of the fact that Massanari shall substitute for Acting Commissioner William A. Halter as defendant in this suit. See Fed.R.Civ.P. 25(d)(1). The parties do not need to take further action to continue this suit. See 42 U.S.C. § 405(g).

Joan H. Deans, J. H. Deans Law Office, Raytown, MO, for plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Erma J. Hill brings suit under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's decision to deny disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 et seq. and supplemental security income ("SSI") based on disability under Title XVI of the Act, 42 U.S.C. § 1381 et seq.[2]

This matter is before the Court on plaintiff's Motion For Judgment (Doc. # 7) filed April 24, 2001. For reasons set forth below, plaintiff's motion is overruled.

### Procedural Background

On May 29, 1997, plaintiff filed applications for disability insurance benefits and SSI, claiming that she has been disabled since May 23, 1997, as a result of post cerebrovascular accident with residual memory loss and lower extremity pain as well as uncontrolled hypertension (high blood pressure) and depression. Tr. 89–90, 153. The Commissioner denied plaintiff's applications initially and upon reconsideration. Tr. 326, 328. On March 4, 1999, Administrative Law Judge John J. Rubin (the "ALJ") held an administrative hearing at plaintiff's request. Tr. 116–17. On August 3, 1999, he found that plaintiff was not disabled. Tr. 15–29. On October 22, 1999, plaintiff requested review of that decision by the Appeals Council. Tr. 10–14. On October 20, 2000, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ decision the final decision of the Commissioner. Tr. 8–9.

### Factual Background

The following evidence was presented to the ALJ.

---

2. Two social security programs are at issue: Disability Insurance, for qualified individuals who paid social security taxes for the relevant period, and Supplemental Security Income, for individuals who did not. The pertinent regulations are the same for both programs. See *Eads v. Sec'y of Dep't of HHS*, 983 F.2d 815, 816 (7th Cir.1993).

Plaintiff, Erma J. Hill, is 57 years old. Tr. 38. She is 5′4″ tall, weighs 183 pounds and is right-handed. Tr. 46. She has a high school education and last worked in 1987 as a parking attendant at the Wyandotte County Courthouse for roughly two months. Tr. 38, 49.

Plaintiff's work history is as follows. She learned data transcribing at the Internal Revenue Service ("IRS") during training for a seasonal job as a keypunch operator in 1964.[3] Tr. 66–67, 185. She used this training in later employment when she worked for the University of Kansas Medical Center from 1974 to 1979 as a keypunch operator. Id. Next, plaintiff worked for the Social Security Office from 1979 to 1989 as a data transcriber. Tr. 50. Plaintiff does not think that she could perform this job again due to her memory problems. Tr. 69. Plaintiff could not account for her income from 1992 through 1994, but her earnings exceeded $5,000 in only one year.[4] Tr. 51–52. Plaintiff then cleaned offices for two years, from November of 1995 to February of 1997. Tr. 49. Her work involved cleaning tables and emptying trash. Tr. 49 50. Plaintiff did not lift over 20 pounds during this job.

Tr. 50. Plaintiff's next employment, with Wyandotte County, ended after two months, following a stroke. Tr. 47. Currently plaintiff lives on monthly welfare payments of $196 and $118 a month in food stamps. Tr. 52. Plaintiff's monthly rent of $49 is subsidized by HUD. Id.

At the administrative hearing, plaintiff testified that her disability began on May 23, 1997 when she fell due to a stroke while working as a parking attendant for Wyandotte County.[5] Tr. 47, 75. Following the stroke, plaintiff did not return to work. Tr. 49. Dr. John Gamble, a physician at Bethany Medical Center, examined plaintiff after the incident and made a diagnosis of hypertension and prescribed left knee exercises.[6] Tr. 287. Her blood pressure reading at that time was 150/100.[7] Id.

On May 29, 1997, six days after her stroke, plaintiff filed a disability claim with the Social Security Administration. Tr. 147. The interviewer noted that plaintiff limped and walked slowly. Tr. 150. Plaintiff claimed that she had severe hypertension resulting in dizziness and slow reflexes that kept her from working. Tr. 153. Plaintiff also claimed that she could not drive due to blurry vision. Tr. 176.

Plaintiff next appeared at the hospital on June 7, 1997.[8] During a visit to her

3. The Court cannot discern the duration of plaintiff's employment with the IRS.

4. The parties did not address the gap in plaintiff's employment record from 1989 through 1992.

5. Initially plaintiff claimed that her disability started on April 1, 1997. Tr. 46. The earliest in-patient hospitalization that the ALJ found, however, was June 7, 1997. Tr. 48. Nonetheless, the ALJ and plaintiff agreed to date her disability from May 23, 1997, when she fell at work due to an alleged stroke, went to the emergency room and did not return to work. Tr. 75–76.

6. The Doctor's note concerning this visit is not wholly legible, but it appears that the

examination did not discover any impairments aside from plaintiff's left knee weakness and blood pressure. Tr. 287.

7. According to the Framingham Heart Study, a blood pressure reading from 140 to 160 over 90 to 95 is considered borderline high blood pressure. See Stedman's Medical Dictionary (26th ed. 1995) ("Stedman's") at 831. Plaintiff's brief states that her blood pressure was 150/90, but that claim is not accurate according to the Doctor's note. See Memorandum In Support Of Motion For Judgment (Doc. # 8) filed April 24, 2001 at 6; Tr. 287.

8. The record is not clear on the duration of plaintiff's stay in the hospital, but it appears that she checked out on the same day.

beauty salon, plaintiff had been unable to stand. An ambulance transported plaintiff to the emergency room and, according to beauty salon and ambulance personnel, she was confused. Tr. 208, 217. The emergency room report states that plaintiff had no complaints once she arrived at the emergency room, and that she denied any pain and said she felt fine, even though she had not eaten. Tr. 217. A physical examination by Dr. Dawna McCulloch revealed no abnormalities, but an electrocardiogram showed a "borderline first degree atrioventricular block" and some "nonspecific T wave abnormalities in V4 through V6," and laboratory work indicated a slightly elevated CPK of approximately 350.[9] Id. Radiology conducted a "computed tomography" report that revealed no abnormalities except for a minute area of transparency in the right basal ganglia which would be compatible with an old "lacunar infarct." [10] Tr. 218. Plaintiff's blood pressure was 137/77 sitting and 145/86 standing. Dr. McCulloch opined that plaintiff suffered a

possible "transient ischemic attack" and ordered outpatient tests to confirm the diagnosis.[11] Tr. 217.

On June 9, 1997, plaintiff followed up her emergency room visit with outpatient tests by Dr. Gamble. Tr. 208. Dr. Gamble ordered a carotid doppler test.[12] Tr. 209. The test found "very minimal plaquing involving both carotid bifurcations with no hemodynamically significant lesion with stenosis in the range of 0 to 40% bilaterally." [13] Id.

On June 11, 1997, plaintiff went to the emergency room at Bethany Medical Center and complained of weakness in her extremities for the past several days and frequent falls. Tr. 224. The emergency room physician, Dr. Sandra Edwards, found that plaintiff had only ⅘ strength in her right leg and decreased density in a portion of her brain that indicated some cell death.[14] Tr. 229. An examination of plaintiff's heart revealed that its size was at the upper limits of normal and that there were atherosclerotic changes in the thoracic aorta.[15] Tr. 231. Dr. Aditya Ver-

---

9. Plaintiff does not provide any definitions for these terms, but nonspecific T wave abnormalities indicate an abnormal heart rhythm. See *Rippy–El v. Makram*, 210 F.3d 355, 2000 WL 426202, at *1 (2d Cir. Apr.14, 2000). Apparently plaintiff may have had some blockage in her bloodflow and also had a slightly elevated isozyme reading that might indicate an insufficient blood supply to the heart. See Stedman's at 165, 408.

10. Again, plaintiff does not define these terms, but "computed tomography" is the gathering of anatomical information from a cross-sectional plane of the body, presented as an image generated by a computer synthesis of X-ray transmission data obtained in many different directions through the given plane. See Stedman's at 1819–20. The transparency indicated a death of cells in a very small area at the base of plaintiff's brain. See Stedman's at 702, 867, 930. A "lacunar infarct" is evidently a type of small, fixed stroke. See *Pers. Pool of Ocean County, Inc. v. Trs. of Heavy and Gen. Laborers' Welfare Fund of New Jersey*, Locals 472–172, 899 F.Supp. 1362, 1370 (D.N.J.1995).

11. Transient ischemic attacks are basically miniature strokes. See *Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1062 (10th Cir.2001).

12. A carotid doppler test uses an ultrasonic beam to diagnose peripheral vascular and cardiac disease. See Stedman's at 285, 517.

13. In other words, the test did not reveal many differentiated areas on the carotid arteries and no significant lesions affecting blood circulation or narrowing of the cardiac valves in the range of 0 to 40%. See Stedman's at 777, 1375, 1673.

14. The record is not clear where Dr. Edwards found these symptoms, but the Court presumes that Dr. Edwards was referring to cerebral damage since the radiology report indicates that the finding was made during a scan of plaintiff's head. Tr. 230.

15. More plainly put, plaintiff had deposits in a portion of her aorta. See Stedman's at 110, 162.

ma also performed an echocardiagram on plaintiff.[16] Tr. 240. She found mild hypokinesis (diminished or slow movement) of the septal, anterior and lateral wall and mild to moderate hypokinesis of the posterior and inferior wall. Tr. 240; see Stedman's at 836. Dr. Verma also noted that the left atrium was at the upper size limit of normal and found some mild calcification. Tr. 240. Dr. Gamble examined plaintiff and found that she had suffered a basal ganglia lacunar infarct, or death of cells at the base of her brain, and that she had hypertension. Tr. 224, 225. Dr. James S. Applebaum, a neurologist, also examined plaintiff. Tr. 227. He found nothing remarkable aside from some unsteadiness in her gait with right dysdiodochokinesia, some decreased sensation to vibration in the lower legs and decreased proprioception.[17] Tr. 227. Dr. Gamble prescribed Darvocet–N for plaintiff's leg pain in the hospital and on-going Procardia to control her blood pressure.[18] Tr. 224. Dr. Gamble also told plaintiff to increase her fruit, vegetable and water intake and to notify the hospital if she suffered any increased weakness. Tr. 244. The hospital discharged plaintiff on June 13, 1997. Tr. 224.

Plaintiff next went to the emergency room at Bethany Medical Center on June 17, 1997, complaining of mobility problems. Tr. 248. Specifically, she said that she had numbness and tingling on her right side. Tr. 249. Dr. Applebaum conducted a physical examination which revealed that plaintiff had difficulty walking and mild weakness in her right leg. Tr. 251. Dr. Applebaum concluded that plaintiff had suffered a "lacunar cerebrovascular accident" (stroke), but that there seemed to be a nonphysical component of plaintiff's symptoms, including some embellishment of her symptoms. Tr. 252. The radiology report of plaintiff's lumbar area indicated that she had narrowing disc space at L5–S1 that was compatible with degenerative disc disease and that she also had a large calcified uterine fibroid in her pelvis region. Tr. 254. An examination of plaintiff's head revealed no abnormalities. Tr. 255. Another scan performed on June 18 revealed that plaintiff might have suffered a bit of hemorrhaging during a stroke. Tr. 272. Dr. Gamble instructed plaintiff to follow a low sodium diet and to drink ample water. Tr. 262.

On June 20, 1997, Dr. Gamble dictated a letter regarding plaintiff's condition. Tr. 268. He stated that he had treated plaintiff for left knee weakness and that he had last seen her on May 23, 1997.[19] Tr. 268. He also opined that she could not participate in the work force at that time because she had lower extremity weakness, difficulty walking and a history of hypertensive vascular disease. Id. He also stated that plaintiff had suffered a basal ganglia infarction. Id. Dr. Gamble noted, however, that treatment kept plaintiff's hypertension under good control and that her neurological examination was intact. Id.

On July 2, 1997, plaintiff had a follow-up visit with Dr. Applebaum. Tr. 271. He

---

**16.** An echocardiagram is the ultrasound investigation of the heart and its vessels. See Stedman's at 540.

**17.** Plaintiff does not define these terms. Dysdiodochokinesia is an impairment of the ability to perform rapidly alternating movements. See Stedman's at 530. Proprioception is the subconscious sense of the movements and position of the body, especially the limbs. See id. at 1439.

**18.** Darvocet–N is a mild narcotic analgesic generally prescribed for the relief of mild to moderate pain. See Physician's Desk Reference (54th ed.2000) at 1574. Procardia is a calcium channel blocker used to treat hypertension. See id. at 2363–64.

**19.** This date is apparently inaccurate. The records reveal that Dr. Gamble treated plaintiff on June 11 and 18, 1997. Tr. 228, 248.

documented the visit in a letter to Dr. Gamble and stated that while plaintiff's leg was quite a bit better, she reported forgetfulness that had gotten worse since her stroke. Id. He also noted that she had possibly suffered a small petechial hemorrhage when she had a lacunar infarct in her left internal capsule and that her blood pressure was high at 150/90.[20] Id. Dr. Applebaum noted that plaintiff did not appear to be suffering from any type of dementia, but that they should keep in mind the possibility of depression or stress. Id.

On August 6, 1997, plaintiff visited Dr. Applebaum and he sent a letter to Dr. Gamble concerning plaintiff's condition. Tr. 270. Dr. Applebaum noted that plaintiff's blood pressure was high at 180/110 and that she had difficulty remembering the date, but not the month or year.[21] Id. She did not seem to have any other mental problems, although her sister noted that she had trouble with her memory and suffered frequent headaches. Id. Dr. Applebaum told plaintiff that hypertension likely caused these problems, but he also told Dr. Gamble that he was concerned about the possibility of multi-infarct dementia since plaintiff had suffered several strokes. Id. Dr. Applebaum also noted that plaintiff's right leg weakness was gone. Id.

On August 27, plaintiff again visited Dr. Gamble. She complained of constipation and left calf pain and weakness. Tr. 283. Dr. Gamble noted 1☞ edema on her lower left leg and a positive Loman's sign.[22] Id.

On September 15, 1997, Dr. Gamble dictated a letter which stated that plaintiff was totally disabled because she suffered weakness in her legs, difficulty walking and a mental status change.[23] Tr. 273. Dr. Gamble also stated that plaintiff had suffered moderate to severe hypertension and a cerebral infarction. Id.

On October 3, 1997, Dr. Gamble again dictated a letter which reported that plaintiff was disabled and unable to work. Tr. 274. He stated that although plaintiff's CVA (cerebrovascular accident) had improved satisfactorily, plaintiff's staggering gait, difficulty in getting up and down from a sitting position and memory loss rendered her unfit to work. Id. He also stated that he had last seen plaintiff on August 27, 1997 when she reported her problems as post CVA, basic ganglia infarction, constipation and hypertension.[24] Id.

On October 14, 1997, Dr. Gerald H. Vandenberg, a clinical psychologist, examined plaintiff. Tr. 275. Plaintiff took a taxi to the appointment and arrived fifteen minutes early. Tr. 276. Her sister accompanied her. Id. Plaintiff was casually and neatly groomed and did not show any sign of acute distress. Id. Plaintiff complained that she had trouble remembering things, her hands felt weak and she has some dizziness. Tr. 275. She also complained of intermittent depression, inability to sleep well and compulsive eating. Tr. 276. A typical day consisted of plaintiff getting up, fixing breakfast, cleaning house and

---

**20.** In other words, plaintiff may have had a minute amount of hemorrhaging or bleeding, when she suffered the stroke, or death of brain cells. See Stedman's at 1336.

**21.** Dr. Applebaum noted that plaintiff's blood pressure had been fine when she was on Procardia XL instead of Verelan, the blood pressure medication she was on at that time. Tr. 270.

**22.** Edema is an accumulation of an excessive amount of watery fluid in cells, tissues or serous cavities. See Stedman's at 544. The "positive Loman's sign" is not explained in the record.

**23.** The record does not indicate exactly what Dr. Gamble meant by "mental status change."

**24.** Post CVA refers to a post-cerebrovascular accident, or a stroke. See Stedman's at 424.

then watching television or talking on the phone. Tr. 275. Evenings were spent watching television or attending church services on Tuesday nights. Tr. 275–76. Plaintiff said she enjoyed reading and did not have difficulty concentrating when she read. Dr. Vandenberg observed that although plaintiff was unable to tightly grip his fingers or tap her index and thumb together, she was able to hold a pencil well enough to draw and turn the pages of the test booklets. Tr. 275, 277. Plaintiff's categorical abstract reasoning score was below average, but she was able to conclude that both a zipper and a button were fasteners and that "don't count your chickens ..." meant "I guess don't bank on nothing you don't have." Tr. 276. Recent and remote memory appeared intact since plaintiff could name presidents, state who was president during the Civil War and identify Martin Luther King. Id. Plaintiff scored at the 4th percentile on a logical memory test, but scored in the 18th percentile on delayed recall. Id. Plaintiff was able to recite six digits forward (51st percentile), but only three backward (16th percentile). Id. On a visual digit memory test, however, she scored in the 55th percentile forward and the 46th percentile backward. Id. Plaintiff made one error counting by three to 40 and completed the task in an acceptable 43 seconds. Tr. 276. Plaintiff made one error reciting the alphabet and made rather improbable errors in counting backwards from 20 (plaintiff did fine until 12 at which point she skipped to 2, 1). Id. Dr. Vandenberg concluded that plaintiff approached the testing with an inconsistent motivation, appearing to put forth virtually no effort in some parts. Id.

Plaintiff would miss relatively easy items and then respond correctly to more difficult ones.[25] Tr. 276–77. Subtest scores ranged from 4th percentile to 55th percentile in no logical fashion. Tr. 277. Ultimately, Dr. Vandenberg concluded that plaintiff lacked credibility. Id. He found that her complaints of weakness in her hands did not reconcile with her behavior on the testing. Id. In addition, the subtest responses did not present a discernible pattern reconcilable to a disorder or syndrome. Id. Dr. Vandenberg found that due to plaintiff's lack of motivation and investment in the testing, the results of the tests did not correlate to any possible residual effects of a stroke. Tr. 278.

Also on October 14, 1997, Dr. Jack Perkins conducted a residual function capacity assessment of plaintiff. Tr. 295–312. Dr. Perkins checked the box for organic mental disorder on the form, but he did not state on what he based this assessment. Tr. 297. He did not check any other mood disorder boxes and noted that plaintiff's mental impairment should seldom result in deficiencies of concentration, persistence or pace culminating in a failure to complete tasks in a timely manner. Tr. 302. He further noted that he had insufficient evidence to determine whether plaintiff would have episodes of deterioration or decompensation in the work environment. Id. Regarding physical limitations, Dr. Perkins found that plaintiff could occasionally carry 20 pounds and frequently carry 10 pounds. Tr. 305. She could stand or walk for at least two hours and sit for about six hours (with normal breaks) in a workday. Id. Plaintiff had unlimited ca-

---

**25.** For example, in the block design test, plaintiff totally missed the first and easiest item on two trials in spite of being shown both times. She then got the more difficult part, but left out the filler blocks. Dr. Vandenberg wrote that "[t]his is a highly unusual response, and does not reflect inability, but rather more likely, faking." Tr. 277. In addition, on some of the verbally presented arithmetic problems, plaintiff immediately responded to the questions with random answers, not taking time to compute. Id. She also went to the restroom in the middle of the instructions for another subset. Id.

pacity to push or pull items, other than her limitations noted for carrying and lifting. Id. He also noted that plaintiff had some right leg weakness, but that she could frequently balance and occasionally climb, stoop, kneel, crouch and crawl. Tr. 306.

On November 6, 1997, plaintiff visited Dr. Gamble, apparently for a blood pressure check. Tr. 280. He noted that she no longer had any edema.[26] Id. On November 24, 1997, plaintiff visited Dr. Gamble and he noted that she had a staggering gait and hypertension. Tr. 279.

Plaintiff has continued to see Dr. Gamble. The record indicates that she visited him for check-ups and the occasional head cold on December 22, 1997, ten occasions in 1998, and February 15, 1999. Tr. 314–325. Plaintiff's blood pressure ranged from 130/80 to 170/100 on these visits. Id. On December 22, 1997, Dr. Gamble noted that plaintiff's condition was improving and on July 27 and August 27, 1998 plaintiff indicated that she was feeling well. Tr. 318, 319, 325.

At the administrative hearing, plaintiff testified about her disability. She said that her most significant problem is her difficulty with memory. Tr. 53–54. She forgets what day it is and she sets off the fire alarm in her apartment once a month because she does not remember to turn off the stove when she is cooking food. Tr. 54. Also, plaintiff cannot comb the hair on the back of her head. Tr. 56. Plaintiff cannot carry a gallon of milk due to weakness in her hand. Tr. 69. She experiences cramping in her right leg and tingly sensations and numbness in both legs about every other day. Tr. 56. Plaintiff describes this pain as moderate and states that it normally lasts for thirty minutes. Tr. 58. Plaintiff takes two aspirin once a day for this pain. Tr. 59. About twice a week plaintiff lies down for three hours due to this pain. Id. Plaintiff can only walk three or four blocks or up one flight of stairs before her legs begin to hurt. Tr. 57. Her back hurts after she has been on her feet for 30 minutes to an hour. Tr. 71–72. Plaintiff spends most of her day sitting down and watching television. Tr. 60. She is up and about for about four hours a day walking to the grocery store and thrift store. Id. When she is walking, however, she has to take breaks every 30 minutes because she is out of breath. Tr. 60–61. Plaintiff does not lose her breath when just sitting and she has not had a seizure. Tr. 61. Plaintiff does not know if she has any limitations on the amount of time she can stay seated. Tr. 72. Plaintiff also said that she has high blood pressure and is taking Cardizem and eating a low sodium diet.[27] Tr. 54. She is also taking a medication for water retention and a potassium supplement, K–Dur. Tr. 55–56. Plaintiff states that she has problems with severe pain in her stomach, but that she does not take medication for that ailment since Medicare would not cover that prescription and the medication is too expensive. Tr. 61–62. She also has headaches about every other day that go away

26. Plaintiff states that she tested positive for S1 and S2 heart murmurs at this time. See Memorandum In Support Of Motion For Judgment (Doc. # 8) at 10. The Court is unclear, however, on plaintiff's documentation of this condition. Dr. Gamble made a note that says "Heart S1 S2 ⟲" but there is no further explanation. Tr. 280. While one interpretation of this note is that plaintiff tested positive for heart murmurs, the Court found this same exact notation on several of Dr. Gamble's other notes, and plaintiff only states that she tested positive for heart murmurs on two occasions. Plaintiff has the burden of proving her disability to the Court, therefore the Court will not guess at possible inferences that might be made from scribbled and partially illegible doctor's notes.

27. Cardizem is used to control hypertension and angina. See Physician's Desk Reference at 1358.

in roughly an hour if she takes over-the-counter medication for them. Tr. 70. Plaintiff cannot see distances, but her vision is fine with glasses. Tr. 62. Plaintiff does not use a cane or crutch. Id. Plaintiff does not bend over too much due to pain. Tr. 63. Plaintiff does not have a car, but she does have a driver's license. Id. She is afraid to drive, however, for fear of getting lost. Id. Plaintiff does not engage in any outdoor activities since she finds it painful to bend over, stoop or squat down. Tr. 72–73.

Plaintiff generally goes to bed at 10:30 p.m. and gets up around 7:30 or 8:30 a.m. Tr. 63. About every other night plaintiff has difficult getting to sleep. Tr. 63–64. On those nights, she generally gets four hours of sleep. Tr. 64. Plaintiff generally eats breakfast at 8:30 a.m., lunch between 11:30 a.m. and noon and dinner at 6:00 p.m. Id. She typically fixes her own meals, although her sister occasionally brings her food. Tr. 74. Her sister also assists her with cleaning. Tr. 64–65. Plaintiff can mop her kitchen floor in 15 minutes, make her own bed and do her own laundry in the laundry room which is located on the same floor as her apartment. Tr. 65. Her sister vacuums her apartment for her. Id. Plaintiff does not visit any friends or relatives other than her sister, but she gets along fairly well with others. Id. Plaintiff does get nervous and upset about once a month when she cannot remember things and loses money. Tr. 65–66. Plaintiff's chief hobby is playing the piano, and she is reasonably proficient. Tr. 66. In addition, plaintiff reads newspapers and books. Tr. 73. She can read for at least an hour and comprehend, understand and remember what she has read. Id. Plaintiff also attends three hour church services about twice a month. Tr. 68. She is able to sit through the entire service. Id. Plaintiff can add and subtract, but she states that she is not very good at multiplying, dividing and figuring percentages, decimals and fractions. Tr. 67. Plaintiff does not think that she could speak in front of a group of people. Tr. 68. Plaintiff does not think that she could perform an assembly job due to her problem gripping things with her hand. Tr. 69.

Mildred Henson, plaintiff's sister, testified at the administrative hearing. Henson lives about ten minutes from her sister and sees her three to four times a week.[28] Tr. 39. She testified that since plaintiff had a stroke in 1997, she has had difficulty remembering the date, the location of items and how to get places. Tr. 39–40. She has also occasionally forgotten where she is and how to get home, so that public transportation would be difficult for her to use. Tr. 41. According to Henson, plaintiff can count money, shop for her own groceries and clean her own apartment. Tr. 40–42. If she is on her feet for an hour to an hour and a half, however, she stops to rest due to pain in her leg. Tr. 40–41. Henson testified that plaintiff has difficulty combing the back of her hair because she cannot grip the comb very well. Tr. 42. Plaintiff can carry small items. Tr. 43.

The Commissioner retained Marianne Katherine Lumpe to testify as a vocational expert. Lumpe testified that plaintiff had worked as a data entry clerk, which is a sedentary and semi-skilled job, and as a janitor doing light cleaning, which is a light labor and unskilled position.[29] Tr. 77.

---

**28.** Plaintiff argued in her brief that Henson testified they saw each other three to four times *daily,* but that is not accurate according to the record. See Memorandum In Support Of Motion For Judgment (Doc. # 8) at 4; Tr. 39.

**29.** Lumpe testified that data transcriber was not in the Dictionary of Occupational Titles and that data entry was the closest match. Tr. 77.

The Commissioner asked Lumpe to consider the following hypothetical:

Assume ... [plaintiff's] age, educational background and her past work experience as previously described. Assume further that ... [plaintiff's] ability to perform work is limited as follows ... she cannot lift over ten pounds frequently or 20 pounds occasionally. Assume that [plaintiff] could not perform any work activity requiring prolonged standing or walking. And by that, I mean, she could not walk more than 15 minutes at a time or more than two hours total in an eight hour day. Assume that [plaintiff] could not perform any work activity requiring frequent climbing, bending, stooping, squatting, crouching, crawling or kneeling. She could perform those postural activities occasionally but not frequently during the workday. And in addition to those physical limitations, [plaintiff] has ... the following mental functional limitations. In the areas of activities of daily living, social functioning and that includes working with and interrelating with coworkers, supervisors and the public, deficiencies of concentration, persistence and pace sufficiently severe so as to preclude completion of tasks in a timely manner and that would include such areas as understanding, remembering and carrying out simple but complex job instructions and also maintaining required attention, persistence and pace necessary to meet the productivity and performance standards in unskilled occupations and episodes of deterioration or decompensation in work settings, as those four mental areas are described and defined in the Commissioner's regulations ... Assume that [Hill] has slight restriction on her activities of daily living from a mental standpoint, slight difficulty in maintaining social functioning, assume that she seldom has deficiencies of concentration, persistence or pace so

as to preclude completion of work tasks in a timely manner. And in indicating the frequency seldom, I would mean to indicate that such deficiencies would occur less than once a day, on the order of once or twice a week, and assume that she's never had an episode of deterioration or decompensation in work settings.

Tr. 77–79. Based on the hypothetical, Lumpe testified that plaintiff could work in her past occupation as a data entry clerk.

The Commissioner then proposed a second hypothetical question based on all of the forgoing information, except that, "she would now often, rather than seldom, have deficiencies of concentration, persistence or pace sufficiently severe so to preclude completion of work tasks in a timely manner. And by indicating often, I would mean that such deficiencies would occur on the order of at least once a day." Tr. 80. Based on the second hypothetical, Lumpe testified that plaintiff would not be able to return to her previous work, nor is there any work existing in significant numbers in the national economy that she would be able to perform. Id. Upon examination, Lumpe stated that the data entry job that she had looked up required "math to subtract, divide, multiply, all units of measure and common decimal fractions, compute ratios and percentages, draw and interpret bar graphs, [and] perform arithmetic operations involving amounts of money." Tr. 81. Lumpe also testified that it would take three to six months for the average person to gain proficiency in data entry. Tr. 80. Lumpe further stated, however, that "every job does not require those specific aptitudes or that level of an aptitude." Tr. 82. Lumpe testified that data entry clerk jobs have changed between the time plaintiff learned the required skills in 1989 and now in that computers are the primary equipment. Tr. 83–84. Since plaintiff had been trained on a computer, however, the necessary job skills have not

changed. Tr. 84. Even though plaintiff has been out of the data entry field for ten years, Lumpe opined that orientation, but not re-training, would be necessary to return to her previous work. Tr. 87. The Commissioner then asked Lumpe, based on her review of plaintiff's file and her observations of plaintiff during the hearing, if it appeared that she performed her job of data entry clerk successfully for the Social Security Office for ten years. Tr. 86. Lumpe replied that it appeared that plaintiff had performed her job successfully. Tr. 87.

In his order of August 3, 1991, the ALJ made the following findings:

1. Claimant met the insured status requirements of the Act on May 23, 1997, the date of her alleged onset of disability, and continues to do so through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since May 23, 1997.

3. The medical evidence establishes that claimant has the following severe impairments: status post cerebrovascular accident, May 23, 1997; obesity; hypertension degenerative disc disease, L5–S1; and mild depression (not separately severe). However, claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Part A, Appendix 1, Subpart P, 20 CFR Part 404.

4. For reasons explained in the body of this decision, the testimony of claimant is not found credible. The testimony of the claimant's sister is found credible to the extent of the findings herein.

5. Claimant's impairments, in combination, cause her to have the following functional limitations: she cannot engage in work activity requiring lifting more than 10 pounds frequently, or more than 20 pounds occasionally; she cannot engage in work activity requir-ing standing and/or walking than 15 minutes at a time, or more than two hours total in an eight hour day; and she cannot engage in work activity requiring frequent climbing, bending, stooping, squatting, crouching, crawling, or kneeling. Moreover, claimant's mental impairment, which is not considered separately severe, imposes on her the functional limitations set forth in the attached Psychiatric Review Technique Form, which is incorporated herein by reference.

6. Considering claimant's above-described residual functional capacity and vocational profile, claimant has been able to perform her past relevant work as a data entry clerk, both as she performed it and as it is customarily performed in the national economy, at all times relevant to this proceeding. This finding is based on the testimony of the vocational expert.

7. Claimant has not been under a disability as defined in the Social Security Act, as amended, at any time relevant to this decision (20 C.F.R. 404.1520 and 416.968).

Tr. 27–28.

## Standard Of Review

The ALJ's decision is binding on the Court if supported by substantial evidence. See 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. See *Castellano v. Sec'y of HHS*, 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d

842 (1971). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (citation omitted).

### Analysis

 Plaintiff bears the burden of proving disability under the SSA. See *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. See 42 U.S.C.A. § 423(d)(1)(A) (1996). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1996). If a claimant satisfies steps one, two and three, she will automatically be found disabled; if a claimant satisfies steps one and two, but not three, then she must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. See *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988).

As the record shows, plaintiff is not currently working and the Commissioner also found that her impairments "more than minimally restrict her capacity to perform basic work activities" and that she has a severe impairment as defined by the regulations. Tr. 19. Plaintiff thus satisfies steps one and two. At step three of this analysis, however, the ALJ found that plaintiff did not have an impairment or combination of impairments meeting or equaling the level of severity of any impairment described in Appendix 1, Subpart P, 20 C.F.R. 404. Proceeding to step four, the ALJ concluded that plaintiff had not met her burden of proving that she could not perform her past relevant work as a data entry clerk.

### I. Evaluation Of Plaintiff's Credibility

 Plaintiff first argues that the ALJ failed to make proper credibility findings regarding her limitations caused by pain. The Tenth Circuit has set forth the proper framework for analyzing evidence of disabling pain or fatigue.[30] The relevant factors are (1) whether claimant proves with objective medical evidence an impairment that causes pain or fatigue; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain or fatigue; and (3) whether the pain or fatigue is disabling based upon all objective and subjective evidence. See *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Luna v. Bowen*, 834 F.2d 161, 163–64 (10th Cir.1987). Here, plaintiff satisfied the first two factors. See *id.*, 834 F.2d at 164 ("if an impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence") (emphasis in original). In the case at hand, the ALJ found that plaintiff met this burden by submitting medical records showing that she has been diagnosed with status post cerebrovascular accident, obe-

---

**30.** Subjective complaints such as fatigue are generally analyzed under the same standard as complaints of pain. See Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir.1991); Jackson v. Bowen, 873 F.2d 1111, 1114 (8th Cir. 1989).

sity, hypertension, degenerative disc disease (L5–S1) and mild depression (not separately severe). Tr. 19. In addition, plaintiff tied her subjective complaints of pain and fatigue to her documented impairments. Once the claimant has satisfied these two steps, the ALJ must consider all relevant evidence before making a determination of disabled or not disabled. See *Luna*, 834 F.2d at 163. The ALJ must consider plaintiff's assertions regarding subjective conditions and decide whether he believes them. See *id.* at 163. In the final step, the ALJ should consider the following factors:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988).

██ It is at this point that the ALJ often must make a finding as to the claimant's credibility regarding the degree of pain alleged. The ALJ found that although plaintiff's impairments may create certain pain and discomfort, they are not as limiting as she alleges. Tr. 25–26, 28. In reviewing this determination, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS*, 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." *Hamilton v. Sec'y of HHS*, 961 F.2d 1495, 1499 (10th Cir.1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's

subjective complaints are not credible. See *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995); but see *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000) (Kepler does not require formalistic factor-by-factor recitation of evidence). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (quoting *Huston*, 838 F.2d at 1133 (footnote omitted)). "In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements." See Social Security Ruling 96–7p, 61 Fed.Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." See id.

Plaintiff argues that she met the Luna factors for credibility since she took several medications to control her blood pressure, she lays down twice weekly for three hours to relieve her leg and back pain, and Dr. Gamble indicated that plaintiff was unable to perform adequately in the work force because she continued to experience staggering gait problems with difficulty getting up and down from a sitting position and she experienced memory loss, although she had improved from her CVA satisfactorily. See Memorandum In Support Of Motion For Judgment (Doc. # 8) at 16–17. The ALJ, however, did not find plaintiff's complaints to be credible. In finding that plaintiff lacked credibility, the ALJ first discounted Dr. Gamble's finding of disability and inability to perform in the work force. He stated that:

> [plaintiff's] claims of disabling physical and mental limitations are not supported by the objective medical evidence of record. In fact, other of [plaintiff's] treating physicians found claimant's physical and neurological examinations to be near normal, with few objective positive findings or limitations, and observed that

[plaintiff] appeared to be embellishing her symptoms (see Exhibit 4F). Moreover, other objective medical findings of record noted above and below generally indicate examinations were within normal limits or showed no more than mild orthopedic difficulties, with little loss of range of motion, normal sensation of mild sensory loss, and normal mental status. (See Exhibits 2F, 4F, 5F, 6F, 7F, 8F, 9F, 10F, and 12F). As noted above, the medical evidence is replete with opinions by treating and examining physicians and an examining psychologist that [plaintiff] has engaged in malingering and symptom magnification during physical and mental examinations (see especially Exhibit 4F, pp4–5; and Exhibit 9F).

Tr. 25–26. The ALJ also considered plaintiff's daily activity level. He noted that plaintiff's "post-alleged onset date activities of daily living, such as walking four hours a day, standing on her feet in the store for one hour, sitting in church for three hours, playing the piano, and performing household chores shows a level of activity inconsistent with disability." Tr. 26. The ALJ also found that plaintiff "has a record of sporadic work with low level earnings, which indicates she has never been highly motivated to work, even before her alleged onset date of disability." Tr. 26; see *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir.1995) (plaintiff's poor work history relevant to credibility of subjective complaints).

In addition, the ALJ relied on the testimony of plaintiff's sister, which he did find credible. Plaintiff's sister testified that she observed plaintiff was able to "handle money, walk in the grocery store, carry small items into her home, and perform household chores." Tr. 26. The ALJ noted that plaintiff's sister "believed that [plaintiff] could work but for her impaired memory, an area of functioning in which this witness, not a medical professional, must necessarily rely on the self-serving representations made to her by [plaintiff]." Tr. 26.

■ In applying the Luna factors to this case, the Court finds that substantial evidence supports the ALJ's decision. While some factors may support plaintiff's position, the ALJ considered the objective medical record, the testimony of plaintiff's sister and evidence of plaintiff's malingering. Substantial evidence supports his conclusion.

## II. Evaluation Of Dr. Gamble's Opinion

■ Plaintiff next argues that the ALJ improperly discounted the opinion of Dr. Gamble, her treating physician, who opined that plaintiff could not participate in the work force. Tr. 268, 273 and 274. As an initial matter, the Court notes that the ALJ is not bound by Dr. Gamble's opinion. A treating physician's opinion that a patient is disabled is not dispositive, because the disability determination ultimately rests with Commissioner. See *Castellano*, 26 F.3d at 1029. On the other hand, the ALJ must give substantial weight to the opinion of a treating physician "unless good cause is shown to disregard it." *Goatcher v. United States Dep't of HHS*, 52 F.3d 288, 289–90 (10th Cir. 1995). When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the reports of the treating physician. The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. Id. at 290. In addition, the ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of

the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6).

 The ALJ apparently did not analyze the first two factors of the test, but even if the Court considered those favorable to plaintiff, substantial evidence would still support the ALJ's position. As noted above, the ALJ did give reasons for rejecting the opinion of plaintiff's treating physician. Specifically, he stated that:

[t]he undersigned rejects this treating physician's repeated opinion that [plaintiff] is disabled for the following reasons: They are wholly unsupported by any objective medical/clinical/or testing findings of record from this physician. In fact, other of [plaintiff's] treating physicians found [plaintiff's] physical and neurological examinations to be near normal, with few objective positive findings or limitations, and observed that [plaintiff] appeared to be embellishing her symptoms (see Exhibit 4F). Moreover, other objective medical findings of record noted above and below generally indicate examinations were within normal limits or showed no more than mild orthopedic difficulties, with little loss of range of motion, normal sensation or only mild sensory loss, and normal mental status. (See Exhibits 2F, 4F, 5F, 6F, 7F, 8F, 9F, 10F, and 12F).

Tr. 24–25. In other words, the ALJ discounted the treating physician's opinion under the third and fourth factors of the test because he believed that the relevant evidence failed to support it and it was not consistent with the record as a whole. In addition, the reasons which Dr. Gamble gave for plaintiff's inability to re-join the work force, a staggering gait and some lower extremity weakness, did not bear on her ability to perform her past sedentary work as a data entry clerk. Regarding the fifth factor, although Dr. Gamble did mention that plaintiff had a mental status change and has suffered some forgetfulness, plaintiff does not assert that Dr. Gamble is competent to provide a psychiatric or neurological opinion on plaintiff's forgetfulness—the impairment which allegedly bars her from performing the data entry job. Tr. 69, 273, 274. The reports of Dr. Applebaum, a neurologist, indicate concern about forgetfulness and the possibility of dementia. Tr. 270–71. He states, however, that he did not find any sign of dementia and that plaintiff "names, repeats, and comprehends well." Tr. 270. Finally, concerning other evidence brought to the ALJ's attention, the clinical psychologist who examined plaintiff (Dr. Vanderberg) found a possibility of mild depression but no correlation between plaintiff's test score and the residual effects of a stroke, possibly due to plaintiff's lack of motivation during the testing. Tr. 277–278. Based on the record, the Court finds that the ALJ's decision to discount Dr. Gamble's testimony is supported by substantial evidence.

### III. Plaintiff's Ability To Return To Past Relevant Work

Plaintiff also asserts that the ALJ's finding that she could return to her prior work as a data entry clerk is not supported by substantial evidence. Plaintiff asserts that in his step four analysis the ALJ failed to make the findings required by *Henrie v. United States Dep't of Health and Human Serv.*, 13 F.3d 359 (10th Cir.1993). Step four of the sequential analysis, at which the ALJ found plaintiff not disabled, is

comprised of three phases. In the first phase, the ALJ must evaluate plaintiff's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of plaintiff's past relevant work. In the final phase, the ALJ determines whether plaintiff has the ability to meet the job demands in phase two despite the mental and/or physical limitations found in phase one. See *Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir.1996) (citing *Henrie,* 13 F.3d at 361) (internal citations omitted).

Plaintiff first argues that the ALJ did not fulfill the requirements of phase two by delving into the specific requirements of plaintiff's past work as a data entry clerk. The record reveals that the ALJ had a vocational report concerning plaintiff's past work and that the ALJ questioned plaintiff about the requirements of her previous jobs. Tr. 49–51, 66–67, 77, 185–190. The ALJ questions about plaintiff's janitorial job are not wholly relevant since the ALJ used plaintiff's data entry clerk position as her past relevant work experience. The ALJ did ask questions, however, regarding the physical requirements of plaintiff's data entry position.[31] Tr. 50–51. The ALJ then inquired into the educational requirements of plaintiff's job.[32] Tr. 66–67. The ALJ established that plaintiff had been trained for her position as a data transcriber and the expert testified that plaintiff's on-going employment with the Social Security Administration indicated that she had been successful at her job. Tr. 87.

Plaintiff argues that the ALJ's inquiry is not enough since he did not inquire into plaintiff's memory problems vis a vis the requirements of her data transcription job and she stated that she did not think that she could now perform that job due to her forgetfulness. Tr. 69. The record shows,

**31.** The exchange between the ALJ and plaintiff regarding the requirements of her data entry job was as follows:

> Q [ALJ]: And what did you do [for the Social Security Administration]? Were you a data entry person?
> A [plaintiff]: Data transcriber.
>
> . . . . .
>
> Q: So you were primarily seated all day long doing this work. Is that correct?
> A: Yes.
> Q. Except for breaks?
> A. Yes.
> Q. And at a computer terminal?
> A. Yes.
>
> . . . . .
>
> Q. Did you have to do much lifting in that work?
> A. Papers.
> Q. Just small amounts of papers?
> A. Yes.
> Tr. 50–51.

**32.** Specifically, the exchange between plaintiff and the ALJ was as follows:

> Q [ALJ]: How did you learn that [data transcriber] job?

> A [plaintiff]: I got training at IRS.
> Q: Uh-huh. And how long did that take?
> A: About two weeks.
> Q: And the job you did at Social Security, was it the same or similar to the one you did at the IRS?
> A: It was similar to the IRS.
> Q: Well, what was the job—when they trained you at IRS, what did they tell you they were training you for?
> A: Keypunch.
> Q: Keypunch operator.
> A: Uh-huh.
>
> . . . . .
>
> Q: Okay. Were you doing keypunch at Social Security?
> A: I was data transcriber. I would punch into the computer.
> Q: Directly into the computer?
> A: Okay. Instead of in a card?
> Q: Yes.
> Tr. 66–67. The ALJ later asked the expert whether any additional training would be required since plaintiff had already been trained on a computer. The expert replied that "there would not be any significant training or adjustment that would be required ." Tr. 84.

however, that the ALJ did not credit plaintiff's claims of forgetfulness. Tr. 25–26. Aside from the inconclusive psychological exam, plaintiff's self-serving testimony and a precautionary note to watch for dementia from Dr. Applebaum, the record reveals no objective medical documentation of plaintiff's alleged memory problems. Since substantial evidence supports the ALJ's decision to not find plaintiff's testimony credible, an extended inquiry into plaintiff's job requirements would not have altered his decision.[33] The ALJ apparently believed that plaintiff never lost the mental capacity to perform her past employment.

 Plaintiff also argues that, due to its mathematical requirements, the ALJ improperly relied on the expert's testimony that plaintiff could perform her past work as a data entry clerk. Since plaintiff successfully performed her data transcriber duties in the past, and the ALJ did not credit plaintiff's testimony regarding her loss of mental capacity, the Court has no reason to think that plaintiff lost her ability to perform the duties of her data transcription job or be unable to perform the duties of another similar data entry job. Substantial evidence supports the ALJ's determination that plaintiff was able to perform her past relevant employment.

## IV. Consideration Of Plaintiff's Complaints In Combination

Plaintiff finally argues that the ALJ failed to consider her impairments of physical pain and memory loss in combination. This argument lacks merit. As an initial matter, the ALJ found that plaintiff's testimony regarding memory loss was not credible. Furthermore, the ALJ specifically concluded, at step three of his decision, that:

> The medical evidence establishes that [plaintiff] has the following severe impairments: status post cerebrovascular accident, May 23, 1997; obesity; hypertension; degenerative disc disease, L5–S1; and mild depression (not separately severe). However, [plaintiff] does not have an impairment or *combination* of impairments listed in, or medically equal to one listed in Part A, Appendix 1, Subpart P, 20 CFR Part 404.

Tr. 11 (emphasis added). Plaintiff does not specifically state why she thinks the ALJ did not consider her impairments in combination and the Court will not ignore this explicit language in the ALJ's findings which states that he did properly consider in combination those impairments he found credible.

**IT IS THEREFORE ORDERED** that plaintiff's Motion For Judgment (Doc. # 7) filed April 24, 2001 be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that the Commissioner's decision to deny plaintiff social security benefits is **AFFIRMED.**

---

**33.** Plaintiff does not argue that her physical limitations would have barred her from performing her previous job. Even if she had, however, the only physical limitation that is objectively documented is her lower extremity weakness, an impairment that would not be a factor for sedentary employment. At least for the purposes of a data entry job, plaintiff's alleged difficulty in grasping items is belied by her testimony that she plays the piano well and her actions during the psychological exam where she had no difficulty using a pencil to draw or manipulating test booklets. Tr. 66, 275. The ALJ established that plaintiff was able to read and comprehend and also that she could remain seated for at least three hours at a time. Tr. 72–73.