Sharon CULBERTSON, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 5:00CV2739.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 7, 2002.

Michael A. Malyuk, Malyuk, Tucker & Gingrich, Akron, OH, for Sharon L. Culbertson.

Kathleen L. Midian, Office of the United States Attorney, Northern District of Ohio, Cleveland, OH, for Jo Anne B. Barnhart, Commissioner of Social Security.

## MEMORANDUM, OPINION AND ORDER

LIMBERT, United States Magistrate Judge.

Plaintiff Sharon Culbertson (Plaintiff) filed this action against Defendant Kenneth S. Apfel, the Commissioner of the Social Security Administration[1] (Commissioner) on October 26, 2000. *See* ECF Dkt. # 1. Plaintiff seeks judicial review of the Administrative Law Judge's decision pursuant to § 205(g) of the Social Security Act, as amended in 42 U.S.C. § 405(g), denying her claim for disability insurance benefits (DIB) under Title II of the Social

Security Act (Act). *See* 42 U.S.C. §§ 401–433. Plaintiff asserts that the Administrative Law Judge (ALJ) committed numerous errors in his April 26, 2000 decision denying her application under Title II of the Social Security Act for DIB, 42 U.S.C. §§ 401–433. *See* ECF Dkt. # 1, 15, 19.

Plaintiff asserts seven assignments of error in her brief. *See* ECF Dkt. # 15 at 7. Her contentions fall into two broad categories. *See id.* First, Plaintiff maintains that the ALJ erred by making medical judgments without relying upon Plaintiff's treating physicians or retaining a medical advisor to provide opinions. *See id.* Second, Plaintiff argues that the ALJ erred by accepting vocational testimony elicited with a hypothetical that did not contain all of Plaintiff's alleged impairments. *See id.* For the following reasons, the Court REMANDS the instant case for further explanation and fact-finding.

## I. PROCEDURAL HISTORY

Plaintiff filed for Title II benefits on September 14, 1998 alleging disability due to chemical sensitivities, migraine headaches, decreased concentration and narcolepsy. *See* Tr. at 93. On December 14, 1998 the Social Security Administration (SSA) denied Plaintiff's application for Title II benefits. *See* Tr. at 95–98. Plaintiff filed a request for reconsideration on February 24, 1999. *See* Tr. at 99. The SSA denied Plaintiff's request for reconsideration on April 6, 1999. *See* Tr. at 101–103. Plaintiff subsequently filed a request for hearing on June 7, 1999. *See* Tr. at 104–105. A hearing was held on March 2, 2000 before an Administrative Law (ALJ). *See* Tr. at 29–32. Plaintiff, one of her treating physicians, and a vocational expert all ap-

---

**1.** On November 14, 2001, Jo Anne B. Barnhart was sworn in as the new Commissioner of the Social Security Administration. Under Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne B. Barnhart is automatically substituted as the Defendant in this action.

peared as witnesses at the hearing. *See* Tr. at 37–92.

On April 26, 2000, Plaintiff received an unfavorable decision denying her request for DIB. *See* Tr. at 37–92. She appealed to the Appeals Council on May 30, 2000, but on October 12, 2000 the Appeals Council denied her request for review, making the ALJ's determination stand as the final decision of the Commissioner. *See* Tr. at 6–7, 10. On October 26, 2000, Plaintiff filed a complaint in this Court requesting review of the ALJ's decision. *See* ECF Dkt. # 1. The Commissioner answered on February 26, 2001. *See* ECF Dkt. # 13. On March 26, 2001 Plaintiff briefed the merits; the Commissioner responded on May 1, 2001 and Plaintiff replied on May 9, 2001. *See* ECF Dkt. # 15, 18, 19.

## II. SUMMARY OF MEDICAL EVIDENCE

Plaintiff primarily relies on two maladies to buttress her claim for DIB benefits: narcolepsy and chemical sensitivity. *See* ECF Dkt. # 15, 18. The Akron General Medical Center's Sleep Disorder Center originally diagnosed Plaintiff with narcolepsy in August 1994. *See* Tr. at 172. Dr. J. Rafecus, a neurologist, conducted an overnight polysomnogram on Plaintiff in December 1994. *See id.* at 186–187. Plaintiff's multiple sleep latency test was strongly positive for narcolepsy with a mean sleep latency of 1.5 minutes and four sleep onset REM periods out of four naps. *See id.* In June 1997, Dr. S. McPherson, another neurologist, stated that Plaintiff had narcolepsy. *See id.* at 189. Chart notes from Plaintiff's initial visit in September 1997 to the Cleveland Clinic Neurology Department's Sleep Disorder Center indicate a history of narcolepsy and associated hypnogogic hallucinations, sleep attacks, and severe excessive daytime sleepiness which are only partially relieved by drugs. *See id.* at 207.

During a psychological evaluation with Dr. Garland DeNelsky in January 1998, Plaintiff explained that she has been constantly tired as a teenager and adult, and thus took stimulants almost continuously for the past twenty years in an effort to function during the day. *See* Tr. at 196. She stated that she began self medicating at the age of 18 by obtaining most of the stimulants from diet doctors. *See id.* She also related that she has found herself feeling increasingly tired and sleepy as she has aged and this progression would lead her to take increased doses of stimulants to counteract her fatigue. *See id.*

In response to state agency questionnaires dated October 1998, Dr. Beth Wildman and Dr. Mary Kay Schwartz, clinical psychologists, opined that Plaintiff had impaired sustained concentration and persistence. *See* Tr. at 250, 255. In November 1998, Dr. Marianne Raniol reported that Plaintiff's narcolepsy had worsened. *See id.* at 273. Further, Dr. Raniol also reported that Plaintiff began to complain of migraine headaches and chronic daily headaches at the base of the neck. *See id.* at 274. Finally, Dr. Raniol pointed out that Plaintiff had difficulties visualizing words after reading for 10 minutes in addition to problems with sustained concentration. *See id.* at 277.

In December 1998, Dr. Nelson, an anesthesiologist, diagnosed Plaintiff with multiple chemical sensitivity. *See* Tr. at 308. Dr. Nelson supported his diagnosis by relying upon Plaintiff's symptoms that occurred at her workplace, including eczema, congestion and fatigue. *See id.* Additionally, Dr. Nelson supported his conclusion by citing Plaintiff's migraine equivalents, her need to sleep after putting gas in her car, her dizziness from exposure to perfume and her asthma symptoms resulting from exposure to chemicals. *See id.* In January 2000, Dr. Nelson opined that

Plaintiff's chemical sensitivity rendered her disabled and recommended avoidance to treat her condition. *See id.* at 328.

In March 1999, Dr. Wildman, Plaintiff's treating psychologist, opined that Plaintiff's symptoms had gotten much worse and narcolepsy and sleep deprivation impaired Plaintiff's ability to work, not her problems with her psychological state. *See* Tr. at 317. In December 1998, in a teledictation report, Plaintiff's treating neurologist, Dr. Christopher Sheppard, diagnosed Plaintiff with severe narcolepsy. *See id.* at 313. Additionally, Dr. Sheppard stated that despite numerous medications Plaintiff's narcolepsy still caused her significant symptoms manifested by excessive daytime somnolence, frequent need for naps, and disturbed sleep at night. *See id.* at 326. Dr. Sheppard considers Plaintiff disabled by her narcolepsy. *See id.*

## III. SUMMARY OF TESTIMONIAL EVIDENCE

At the hearing held before the ALJ on March 2, 2000, Plaintiff, one of her treating physicians, and a vocational expert all testified. *See* Tr. at 37–92. Plaintiff testified that she is 38 years old, stands five feet, ten inches tall and weighs 175 pounds. *See id.* at 40. She lives by herself. *See id.* at 41. She owns an automobile, but only uses it twice a week traveling to the grocery store/drug store and her doctor's office. *See id.* at 41. Plaintiff completed school through her sophomore year in college, studying psychology and industrial management. *See id.*

Plaintiff last worked in April 1998 as a service quality systems auditor. *See* Tr. at 41. She held this position from approximately 1995 to 1998, and she worked as a quality technician from 1990 to 1995. *See id.* at 42. During the 1980's, Plaintiff worked as a quality assurance inspector for a medical supply company and as a technician in a rubber lab. *See id.* at 43.

Plaintiff has had two surgeries, one to remove a uterine growth in December 1999, and another to remove her gallbladder in 1996. *See* Tr. at 43–44. Two doctors currently provide care to her: Dr. Donald Nelson, an anesthesiologist, and Dr. Christopher Sheppard, a neurologist. *See id.* Plaintiff sees Dr. Nelson every eight weeks and Dr. Sheppard twice a year, but she speaks with each doctor once a month. *See id.* Plaintiff currently takes eight prescription medications daily, including four medications for narcolepsy. *See id.* at 166. She ingests six capsules in the morning, one through four tablets during the day as needed, and two capsules at night to combat the effects of her narcolepsy. *See id.* Plaintiff complained of various side effects from the stable of medication she takes, including headaches, dry mouth, and stomach problems. *See id.* at 46.

Plaintiff described the litany of medical impairments from which she allegedly suffers, including migraine headaches, neck and shoulder pain, narcolepsy, sleep apnea, chemical sensitivity/allergies, and depression and memory problems. *See* ECF Dkt. # 15 at 3. Plaintiff suffers from severe migraine headaches two to three times a week which last several hours to all day long; her migraines differ from the headaches attributed to her medication. *See* Tr. at 47. Plaintiff experiences neck and shoulder pain daily which she imputes to her diagnosed narcolepsy. *See id.* Plaintiff was originally diagnosed with narcolepsy in 1994 by the Akron Medical Center's Sleep Lab. *See id.* at 48. She often fell asleep at work which prompted her to seek medical attention. *See id.* Plaintiff's narcolepsy progressively got worse and forced her to quit working in April 1998; currently, she often falls asleep two times per day, napping for an hour or two each time. *See id.* at 50–52. Plaintiff went on

long term disability and still receives those payments. *See id.* at 58. She described the sleep that occurs during the day as ambiguous, meaning she appears to sleep, but is still aware of ongoing events. *See id.* at 50–52. This impairment also causes Plaintiff to experience hallucinations, for which she takes Prozac. *See id.* at 57. Plaintiff complained of symptoms associated with sleep apnea, stating that she stops breathing occasionally when she sleeps. *See id.* at 51.

Besides narcolepsy, Plaintiff also emphasized her sensitivity to chemicals and accompanying allergies during her testimony. *See* Tr. at 54–55. Substances like pollen, mold, grass, chemicals, perfume, newspaper and cleaning substances apparently sicken the Plaintiff. *See id.* She experiences such disorders as cataplexia, total loss of muscle tone, nose bleeds, deep coughs, congestion and disorientation, memory/concentration lapses when exposed to these substances. *See id.* Plaintiff also feels depressed as a result of her physical problems. *See id.* at 58.

Plaintiff brought one of her attending physicians, Dr. Nelson, to testify as a witness. *See* Tr. at 69–76. Dr. Nelson testified that he diagnosed Plaintiff with multiple chemical sensitivity and he stated that Plaintiff should avoid chemicals and scents because they make her ill and hinder her ability to think. *See id.* at 70, 72. Dr. Nelson, while certified in anesthesia, admitted his lack of certification in the allergy field or environmental medicine. *See*

*id.* at 71. He also opined that he could not think of any work that Plaintiff could perform due to the ubiquitous nature of the chemicals in any workplace. *See id.* at 74.

A vocational expert, Nancy Borgesson, (VE) also testified at Plaintiff's hearing before the ALJ. *See* Tr. at 76–89. The ALJ asked the VE a series of hypothetical questions in an attempt to pin point vocational opportunities available to Plaintiff. *See id.* at 79–81. First, the ALJ asked the VE if there would be any jobs in the economy for a person to perform if they were impaired to the extent the Plaintiff claimed. *See id.* at 79. The VE testified there would be no jobs available. *See id.* Second, the ALJ asked the VE if there would be any job possibilities for a person who is limited to light exertional activity, needs to work in a relatively safe environment, and needs to be in a relatively clean environment, free from excessive dust, smoke fumes, excessive odors and smells. *See id.* at 80. In response to the ALJ's second hypothetical[2], the VE stated that such a person could perform sedentary and unskilled jobs, such as a charge account clerk, and light low-level semi-skilled jobs such as a general office clerk. *See* Tr. at 80. The VE stated that in Northeast Ohio there were approximately 2,000 sedentary, unskilled positions and 4,800 light low-level semi-skilled positions. *See id.*

Upon questioning by Plaintiff's counsel, the VE admitted that her answer to the

2. The ALJ's second hypothetical is as follows, "May I ask you a different hypothetical question. Assume we're discussing a person of the same age, education, work background and this person would be limited to light exertional activity, according to her description of her abilities. Assume that she would need to work in a relatively safe environment, without exposure to unprotected heights, ladders, dangerous work products such as explosives or blasts, sharp objects. She wouldn't be able to climb ladders, or she'd be advised against climbing ladders. And in addition she'd have to work in a relatively clean environment, free from excessive dust, smoke, fumes, excessive odors and smells, where she wouldn't be exposed to harsh or strong chemicals, such as soaps, detergents, insecticides. Would there be jobs which exist in significant numbers in the economy that this hypothetical person could do?" Tr. at 79–80.

ALJ's second hypothetical would change if the hypothetical person experienced either 1) chemical sensitivity causing incoherence or 2) narcolepsy interfering with the ability to perform on a sustained basis. *See* Tr. at 85, 87. During reexamination, the ALJ then questioned the VE regarding her assumptions in the two aforementioned hypothetical inquiries. *See id.* at 87–88. The exchange transpired as follows:

Q. All right. Ms. Borgesson, in some of the questions that [Plaintiff's attorney] asked you did you consider these factors [chemical sensitivity and narcolepsy] and the first hypothetical question when the claimant described her limitation?

A. I might have missed it, Judge. Did you mention the falling asleep and the—

Q. I asked you to consider all the symptoms?

A. Oh, the symptoms, yes, I did consider in that hypothetical.

*Id.*

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

Title II of the Social Security Act provides for disability, survivors, and retirement insurance benefits, *see* 42 U.S.C. §§ 401–33, while Title XVI provides benefits to aged, blind, and disabled persons with limited income and resources, *see id.* at §§ 1381–83d. *See Parker v. Barnhart,* 174 F.Supp.2d 920, 923 (N.D.Iowa 2001). Two social security programs are at issue: Disability Insurance, for qualified individuals who paid social security taxes for the relevant period, and Supplemental Security Income, for individuals who did not. The pertinent regulations are the same for both programs. *See Hill v. Massanari,* 155 F.Supp.2d 1250, 1252 (D.Kan.2001).

Plaintiff can receive benefits only if she is deemed "disabled" under the Social Security Act. *See* 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In applying this standard, the Secretary has promulgated regulations setting forth a five step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *See id.* The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, she is not disabled.

2. If claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

5. Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Lyons v. Social Security Admin.*, 19 Fed. Appx. 294, 300, No. 00–5361, 2001 WL 1110110, *5 (6th Cir. September 13, 2001), unpublished (citing *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529 (6th Cir.1997), *and* 20 C.F.R. § 404.1520(b)–(f)). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

■ Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir.1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See id.; Walters*, 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See Houston v. Secretary of Health and Human Servs.*, 736 F.2d 365 (6th Cir.1984).

■ The Court can remand a case to the Commissioner under sentence four of 42 U.S.C. § 405(g), sentence six of 42 U.S.C. § 405(g), or under both of these sentences. Sentence four provides that a district court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand provides the required relief in cases where there is insufficient evidence on the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir.1994) (citation omitted). In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher*, 17 F.3d at 175. "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Willis v. Secretary of Health & Human Servs.*, 727 F.2d 551 (6th Cir.1984).

■ An ALJ's decision may be reversed and benefits immediately awarded only if the record adequately establishes a plaintiff's entitlement to benefits. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir.1994). Where a adequate record exists, the decision denying benefits can be reversed and benefits immediately awarded if the decision is clearly erroneous, proof of disability

is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *See Faucher*, 17 F.3d 171, 176 (6th Cir.1994). Where further factual issues remain, the case should be remanded for further fact-finding. *See id.*

## VI. LAW AND ANALYSIS

 Plaintiffs asserts that the ALJ committed seven errors in his findings of fact and conclusions of law issued on April 26, 2000. *See* ECF Dkt. #15 at 7. The Court will address Plaintiff's third assignment of error first. *See id.* Plaintiff asserts that the ALJ erred by dismissing and rejecting the testimony of one of Plaintiff's treating physicians, Dr. Nelson, who treats Plaintiff for chemical sensitivity. *See id.* The Court finds that substantial evidence supports the ALJ's rejection of Dr. Nelson's opinion. A treating physician's opinion must be based on detailed clinical and diagnostic test evidence. *See Jones v. Secretary, Health and Human Servs.*, 945 F.2d 1365, 1370 (6th Cir.1991). Dr. Nelson opined that Plaintiff suffers from a disability due to her sensitivity to practically all chemicals and he maintained that Plaintiff's only recourse was to stay home and not work. *See* Tr. at 327–328. However, the diagnostic tests do not support Dr. Nelson's opinion. *See id.* These tests showed Plaintiff's chemical sensitivity to phenol, glycerin, ethanol and formaldehyde, but not to all chemicals. *See id.* at 234. In addition, the regulations governing the evaluation of opinion evidence state that more weight should generally be given, "... to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Dr. Nelson is a board certified anesthesiologist; he is not certified in environment medicine or allergies. *See* Tr. at 21. Thus, the ALJ could properly attribute much less weight to Dr.

Nelson's opinions concerning Plaintiff's allergies or chemical sensitivities. *See* 20 C.F.R. § 404.1527(d)(5). Lastly, the ALJ found Dr. Nelson's testimony to be exaggerated. *See* Tr. at 22. Relying exclusively on theories in textbooks, Dr. Nelson stated that Plaintiff's condition was life threatening. *See id.* For these reasons, the Court OVERRULES Plaintiff's third assignment of error.

While the Court finds Plaintiff's third assignment of error to be without merit, the Court nevertheless finds remand is necessary because the record is insufficient and further fact-finding is necessary regarding the ALJ's lack of articulation relating to his rejection of the treating neurologist's opinion of disability and the ALJ's failure to include all the Plaintiff's alleged impairments in hypothetical questions directed to the VE. *See* Tr. at 22, 79–80.

 Generally, the medical opinions of a treating physician are afforded great weight and these opinions are usually granted more weight than a state examining physician's opinion. *See Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980) (citations omitted). However, treating physician opinions are entitled to great weight only if they are supported by adequate medical data and do not conflict with other evidence in the record. *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir.1997); 20 C.F.R. § 404.1527(d)(2)–(4). Likewise, a treating physician's opinion must be based upon detailed clinical and diagnostic test evidence. *See Bogle v. Sullivan*, 998 F.2d 342, 347–48 (6th Cir.1993). An ALJ is not bound by the opinions of a treating physician when substantial medical evidence exists to the contrary. *See Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir.1994). Although the

ALJ is not bound by a treating physician's opinion, *he must set forth the reasons for rejecting the opinion in his decision.* See *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir.1987) (emphasis added).

In December 1999, Plaintiff's treating physician, Dr. Sheppard, a neurologist, opined that Plaintiff's narcolepsy rendered her disabled. *See* Tr. at 326. He maintained that despite numerous medications at relatively high doses, Plaintiff's narcolepsy still caused excessive daytime somnolence, frequent need for naps and disturbed sleep at night. *See id.* Dr. Sheppard's teledictation report from December 1998 outlined Plaintiff's long history of sleep disorders dating back to her childhood, her earlier use of an assortment of stimulants in an attempt to stay awake during the daytime hours, her subsequent use of prescription drugs which have yielded questionable results and her continuing failure to sleep throughout the nighttime hours. *See id.* at 310–313. Dr. Sheppard also emphasized that of the numerous narcolepsy patients that he has treated, Plaintiff's disease was the most severe and as a result he doubted that she would be able to return to work. *See id.* at 313.

This opinion is entitled to substantial weight because it is supported by diagnostic testing as far back as 1994 confirming the diagnosis of narcolepsy, the neurologist's medical observations, and the lack of medical evidence to the contrary.[3] *See* Tr. at 186–187, 310–313, *and Walters, supra.*

Further, the Court notes that the ALJ found that Plaintiff suffered from a severe impairment[4] due at least in part to her narcolepsy. *See* Tr. at 17, 24. This Court notes that when an ALJ rejects a treating physician's opinion supported by medical evidence, Sixth Circuit case law mandates that he set forth his reasons for rejecting such an opinion. *See Shelman, supra.* In his decision denying Plaintiff's DIB claim the ALJ failed to set forth sufficient reasoning for rejecting the treating neurologist's opinion. *See* Tr. at 14–25.

It appears from the ALJ's April 26, 2000 decision that his only reasons for rejecting the treating neurologist's opinion were Plaintiff's alleged exaggeration in her testimony and his implicit blaming of her sleeping disorders on her long term use of stimulants.[5] *See* Tr. at 22. Also, the ALJ doubted the veracity of Plaintiff's claimed narcolepsy impairment because she apparently traveled to North Carolina in 1998. *See id.* The ALJ, without knowing how Plaintiff traveled such a distance, opined that Plaintiff could not make that trip with her alleged infirmity. *See id.*

The Court points out that the treating neurologist accounted for Plaintiff's discontinued, but long term, usage of stimulants in his diagnosis and opinion contained in his teledictated report. *See* Tr. at 310–313. Additionally, without knowing how Plaintiff traveled to North Carolina, the Court finds that Plaintiff's trip does not provide any support for rejecting the neurologist's opinion. *See id.* at 22.

---

**3.** In fact, during the same time frame, even Dr. Wildman, Plaintiff's treating psychologist noted that Plaintiff's symptoms had gotten much worse and that narcolepsy and sleep deprivation impaired Plaintiff's ability to work, not problems with her psychological state. *See* Tr. at 317.

**4.** "She does have a severe impairment which significantly limits the ability to perform work

related activities." Tr. at 17. "The medical evidence establishes that the claimant has severe multiple chemical sensitivity, narcolepsy, and anxiety disorder ..." Tr. at 24.

**5.** The ALJ insinuates that Plaintiff ingested the stimulants to control her weight, since he emphasizes that Plaintiff obtained the stimulants from diet doctors. *See* Tr. at 19.

■ In sum, remand is appropriate in the instant case because there is a lack of reasoning contained in the ALJ's decision supporting his rejection of the neurologist's conclusions. *See* Tr. at 14–25. For these reasons, the Court REMANDS the instant case for further explanation and fact-finding concerning the ALJ's initial rejection of the treating neurologist's opinion. *See id.* In his successive decision, the ALJ must set forth sufficient reasoning, if he continues to reject the Plaintiff's treating neurologist's opinion concerning Plaintiff's disability status.

In addition, the Court finds that clarification and further fact-finding should be undertaken relating to the underlying assumptions contained within the second hypothetical question presented to the VE by the ALJ. *See* Tr. at 79–80. *See also* fn. 2, *supra*, for the complete text of the second hypothetical question posed to the VE. In the second hypothetical, the ALJ asked the VE if there would be any job possibilities for an average or hypothetical person who is limited to light exertional activity, needs to work in a relatively safe environment, and needs to be in a relatively clean environment, free from excessive dust, smoke fumes, excessive odors and smells. *See id.*

■ The ALJ's second hypothetical suffered from a glaring omission which diminished its relevance greatly. *See id.* While the plain language of the question incorporated chemical sensitivity limitations, it did not contain any reference to narcolepsy, nor the effect a narcolepsy diagnosis would have on this average person's job possibilities. *See id.* Even though the ALJ found Plaintiff suffered from a severe impairment, due at least in part to her narcolepsy, *see* Tr. at 17, 24, he failed to incorporate any reference to narcolepsy in the hypothetical question at issue directed to the VE. *See* Tr. at 79–80

*and* fn. 2, *supra*. A key issue in evaluating the ALJ's decision is whether the VE considered Plaintiff's narcolepsy when she opined that a person with Plaintiff's chemical sensitivities could perform sedentary to light jobs, numbering some 6,800 in the Northeast part of Ohio. *See* Tr. at 80.

Substantial evidence may be produced through reliance on the testimony of a VE in response to "hypothetical" question, but only if the question accurately portrays the claimant's individual physical and mental impairment. *See Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir.1987). The Court finds that the ALJ's questioning of the VE did not accurately portray the Plaintiff's impairments, in particular her sleeping disorders. *See* Tr. at 79–80, *and* fn. 2, *supra*.

Since the second hypothetical question did not address the effects of narcolepsy upon an average person's job possibilities, the VE's answer to the second hypothetical did not constitute substantial evidence of Plaintiff's vocational opportunities. *See* Tr. at 79–80, *and* fn. 2, *supra*. Based upon the foregoing, the Court REMANDS the instant case so that the ALJ can accurately portray the Plaintiff's impairments, including the severity of her narcolepsy, into any hypothetical questions directed to the VE concerning Plaintiff's vocational opportunities.

### VII. CONCLUSION

For the forgoing reasons, the Court OVERRULES Plaintiff's third assignment of error and dismisses this assignment of error with prejudice. Additionally, the Court REMANDS the instant case for further explanation and fact-finding concerning the ALJ's rejection of the treating neurologist's opinion. Further, the Court REMANDS the instant case so that the ALJ can accurately portray all the Plaintiff's impairments, including the severity of

her narcolepsy, into any hypothetical questions directed to the VE concerning Plaintiff's vocational opportunities.